THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLEY BIRGER, Plaintiff in Error.

*Opinion filed February 24, 1928—Rehearing denied April 6, 1928.*

1. CRIMINAL LAW—*when petition for change of venue is properly denied.* A petition for change of venue may be denied when not presented until the term of court succeeding the term at which the indictment was returned and where there is no showing of any cause why the petition was not presented at the first opportunity.

2. SAME—*what determines whether change of venue should be granted.* Upon an application for a change of venue, alleging that the inhabitants of the county are prejudiced against the defendant, the issue to be determined is not whether the evidentiary facts set forth in the petition are proved, but whether, upon the showing made by the affidavits and counter-affidavits, there is reasonable ground for fear that the alleged prejudice actually exists and that the defendant will not receive a fair and impartial trial.

3. SAME—*defendant cannot object to jurors after having accepted them.* Where a defendant exhausts less than one-half of the peremptory challenges allowed him by law, he cannot complain, on review of the denial of his motion for change of venue, that the jury was prejudiced against him and that he should have been tried in another county.

4. SAME—*when grand jurors are selected from body of the county.* Where there is no showing that the names of the grand jurors were not chosen in the manner provided by law, the fact that some of them, upon previous informal notification to appear, were present at the court house and summoned there instead of at their respective homes does not affect their competency, where there is no showing that the summons was not read to them and where the return sets forth that the summons was executed as directed; nor can it be contended that they were selected as by-standers and not from the body of the county.

5. SAME—*when irregularities in selecting grand jury are not fatal.* Mere irregularity in impaneling a grand jury or informality in the manner of summoning the jurors, not affecting their competency, will not vitiate their action, and slight irregularities in the form of the writ or in making the return are not fatal unless the substantial rights of the accused are prejudiced thereby.

6. SAME—*when bill of particulars is not necessary.* It is unnecessary to recite the evidentiary facts in an indictment but it is

sufficient to state the ultimate facts, and a bill of particulars is not necessary where the indictment informs the defendant of the crime charged, sufficiently to enable him to prepare his defense.

7. SAME—*furnishing a bill of particulars rests in discretion of court.* Whether the People shall be required to furnish a bill of particulars in a given case rests in the discretion of the trial court, and it is only in cases where it is clear that there has been an abuse of this discretion that the denial of a motion for such bill is error.

8. SAME—*granting a separate trial rests in discretion of court.* The motion for a separate trial in a criminal case is addressed to the court's discretion, and its action in denying the motion cannot be reviewed unless it appears the discretion has been abused.

9. SAME—*what argument of State's attorney is not a reference to failure of defendant to testify.* It is the right and the duty of the State's attorney, in his argument, to review the evidence and to discuss its weight, and where there is no evidence whatever contradicting the case made by the People, a statement by the State's attorney that the evidence has not been contradicted is not an unwarranted reference to the failure of the defendant to testify.

10. SAME—*State's attorney may refresh recollection by notes on evidence.* The State's attorney, in his argument, may refresh his recollection from minutes of the evidence made by his stenographer where he does not read from a transcript of the evidence, (*People* v. *Willy,* 301 Ill. 307, distinguished.)

11. SAME—*when conviction may be had on testimony of accomplice.* While the testimony of an accomplice must, as a matter of law, be received with suspicion and acted upon with great caution it is nevertheless competent evidence, and a conviction may be sustained on such testimony, uncorroborated, if it convinces the jury, beyond a reasonable doubt, of the guilt of the accused.

12. SAME—*what instruction as to reasonable doubt is not erroneous.* An instruction that a doubt, to justify an acquittal, must be reasonable and arise from "a candid and impartial investigation of all the evidence in the case," is not erroneous in using the word "investigation" instead of the better word "consideration."

13. SAME—*when improper instruction as to reasonable doubt will not reverse.* Giving an instruction stating that "the reasonable doubt that the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case not necessary to constitute the crime charged," although erroneous in not defining the essential and material facts constituting the crime, will not require a reversal where all the other instructions, taken together, correctly inform the jury in respect to the law upon the subject.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. CHARLES H. MILLER, Judge, presiding.

CHARLES A. KARCH, SCERIAL THOMPSON, and R. E. SMITH, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROY C. MARTIN, State's Attorney, and ROY D. JOHNSON, for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Charley Birger, Art Newman, Conrad Ritter, Ray Hyland and Harry A. Thomasson were indicted in the circuit court of Franklin county for the murder of Joe Adams. Ritter was never apprehended. Thomasson entered a plea of guilty and was sentenced to imprisonment in the penitentiary for life. Birger, Newman and Hyland were jointly tried and the jury found them guilty. The punishment of Birger was fixed at death and of Newman and Hyland at life imprisonment. After motions for a new trial and in arrest of judgment had been made and denied, judgments were rendered on the verdicts. By this writ of error Birger seeks a review of the record.

In the latter part of the year 1926 there existed in southern Illinois two groups of men engaged in criminal pursuits and hostile to each other. One of these groups was known as the Shelton and the other as the Birger gang. The members of the Shelton gang lived in and about the city of East St. Louis, in St. Clair county, but often extended their operations into Franklin, Williamson and other counties in southern Illinois. Birger was the proprietor of a roadhouse called "Shady Rest," or "The Cabin," located about ten miles east of the city of Marion, in Williamson county, on Route 13 of the State highway system. Birger's associates, among others, were Newman, Ritter, Hyland and Thomasson. Birger and Newman resided in the city

of Harrisburg, in Saline county.   Ritter and Hyland spent
most of their time at Shady Rest.   Thomasson, who had
lived in the city of West Frankfort, in Franklin county,
made Shady Rest his place of abode in November and the
early part of December, 1926.   From the seventh to the
twelfth of December, Thomasson, under the name of Harry
Johnson, rented, and with one Pearl Phelps, whom he rep-
resented as his wife, occupied, certain rooms in the home
of Mrs. Bessie Rhodes, at 405 West Webster avenue, in
the city of Benton, in Franklin county.   Other men associ-
ated with Birger to a greater or lesser extent were Elmo
Thomasson, a brother of Harry A., Teddy Nurock, Steve
George, Clarence Rone, Harvey Dungey, Joe Todd and
Fred Wooten.   Harry A. Thomasson was nineteen and
Elmo Thomasson was seventeen years of age at the time.

In December, 1926, Joe Adams was president of the vil-
lage of West City, a municipality which adjoins the city of
Benton, the county seat of Franklin county, on the west.
The village has a population of approximately 500.   Adams,
with his wife and two children, lived on the south side of
West Main street, a paved street running east and west
through both West City and Benton.   Birger and certain
of his associates believed that Adams was affiliated with, or
in any event had aided, the members of the Shelton gang.
Enmity existed between Birger and Adams, and the former
had threatened the latter's life on several occasions.   On
October 18, 1926, Birger, with about twelve of his associ-
ates, including Newman and Hyland, drove in two auto-
mobiles to a barbecue located a short distance west of West
City.   Birger, pointing a machine gun at the proprietor,
told him that they intended to kill his friend, Joe Adams.
On the same day Birger and some of his henchmen drove
past Adams' house in an automobile and pointed guns at
Adams and his brother Gus while they stood outside, en-
gaged in conversation.   The lives of the two brothers were
threatened by Birger at the same time.   About the 15th of

November Birger told Mrs. Adams, over the telephone, that her husband would be killed and advised her to obtain additional insurance on his life. A night or two later a bomb thrown at Adams' house from a passing automobile exploded in the front yard, making a large hole in the ground, breaking windows and otherwise damaging the house. On the evening of the 8th of December, David Garrison and Alva Wilson, both twenty years of age, stopped at Shady Rest about three hours. While there Birger offered them $100 if they would go to West City, call a man to his door and shoot him when he appeared. Birger stated that guns and an automobile would be supplied and that a man would accompany them. The name of the person they were asked to shoot was not disclosed. Birger's proposition was promptly rejected by Garrison and Wilson.

On Saturday evening, December 11, 1926, Harry A. and Elmo Thomasson drove to Shady Rest in a stolen Ford roadster. Between nine and ten o'clock Newman called them into the west room of The Cabin and closed the door. Birger and Ritter were present. When the two brothers were seated Birger told them that he had a job which he wanted them to perform on the next day. Newman thereupon inquired of Harry A. Thomasson whether he had ever killed anybody. The latter replied, "No, Art; I never had enough against anyone to kill him." Birger then declared, "We picked you two boys to kill Joe Adams." Newman added that the job would be easy, because no one would suspect the two brothers; that revolvers, an automobile and a driver would be furnished them; that a letter purporting to come from Carl Shelton, whose relations with Adams were friendly, would be addressed to Adams; that they were to go to the latter's house and present the letter to him; that while he was engaged in reading the letter they should shoot him, and that in the event of his absence from home they should wait until he returned. In carrying out this plan the use of the Ford roadster was suggested, but

opposition was made thereto, and Birger then proposed that a Chrysler automobile should be used instead and that this car be burned after the crime had been committed. Following this conversation Hyland was called into the room, whereupon Birger, addressing him, said, "Jew, we want you to drive the Chrysler car to-morrow to kill Joe Adams." Newman made some derogatory remark concerning Hyland's lack of courage when the latter answered Birger, "I don't know, Charley; I will think it over." Harry A. Thomasson told Birger that he would have to leave to care for the livestock of his brother Fred and to buy coal and groceries. Elmo Thomasson also said that he was compelled to leave. Birger answered that one was enough to attend to the livestock; that Elmo must remain, and that if Harry did not return the following morning, he, Birger, would send for him. Elmo stopped at Shady Rest that night, but Harry left and reached his home in Benton about two o'clock on Sunday morning. Nine hours later Hyland and Elmo Thomasson called for Harry and the three returned to Shady Rest, arriving there about one o'clock in the afternoon. They went to the basement, where, among other persons, they found Newman and Ritter. Newman asked Harry A. Thomasson whether he was "getting shaky," and the latter replied, "Just a little." Newman and Ritter then called the two brothers into a conference in a room up-stairs. Hyland soon followed Ritter, handed a gun to Newman and said, "This ought to do, hadn't it?" Newman answered in the affirmative and continued, "Jew, take this down to the basement and poison and split the bullets." Hyland complied with the request. Ritter wrote a note, inclosed it in an envelope addressed to Joe Adams, sealed the envelope and gave it to Elmo Thomasson. Hyland returned to the room and handed a revolver to Newman, who examined it, smelled the bullets and exclaimed, "That ought to get him; if one of them ever hits him he will never get well." Newman then gave the revolver to

Harry A. Thomasson. His brother, Elmo, already had a revolver. Newman gave the two brothers and Hyland further directions concerning their part in the plot to kill Adams, and stated that after he was shot, he, Newman, would meet them at the junction of Routes 2 and 14 of the State highway system, approximately eighteen miles west of the city of Benton; that from this point they would proceed south on Route 2 about three miles to a certain roadhouse at Dowell, in Jackson county, and that then they would be taken to Birger's and Newman's homes in Harrisburg, where they might remain as long as they desired. Before leaving, Newman and Ritter gave the Thomasson brothers and Hyland each two glasses of whiskey. Newman and his wife, and Ritter and Ollie Potts, his paramour, entered a closed Chrysler automobile. Another closed Chrysler car covered with mud, driven by Hyland and carrying Harry and Elmo Thomasson, followed. The cars proceeded west on Route 13 to the city of Marion and thence north on Route 37, avoiding the densely populated portions of the city, to an automobile accessory shop a short distance north of the city limits. At this shop Newman and Ritter bought a fan-belt and gasoline for the car Hyland was driving. While the belt was being adjusted Newman came to the second car and told its occupants that he would meet them at the junction west of Benton, and he suggested that they drive carefully, since he had a long distance to go in order to meet them. Newman's car was turned south to reach the junction by Route 37 to Marion, Route 13 west to Carbondale and Route 2 north to the junction. Hyland drove north over Route 37 to Benton and thence to the home of Mrs. Rhodes, where Harry A. Thomasson had rented rooms. After stopping here a few minutes the car was driven about five blocks north and west to a point a short distance east of the home of Adams. The two brothers left the car at this point. Hyland drove on and stopped about a block west of Adams' house. The

Thomasson boys walked rapidly to the house, knocked at the front door, and Mrs. Adams opened it. Elmo Thomasson inquired whether Adams resided there, and, upon receiving an affirmative answer, further inquired whether he was at home. Mrs. Adams replied that he was asleep. One of the boys told her that they had a letter from Carl Shelton for her husband and that they wished to see him personally. Mrs. Adams called her husband and he came to the door. Elmo Thomasson gave Adams the letter, which read as follows:

"*East St. Louis, January.*

*Friend Joe:* If you can use these boys please do it. They are broke and need work. I knew their father.

C. S."

Adams began to read the note, whereupon both boys fired at him. He exclaimed, "My God! they have shot me!" and fell to the floor. The boys ran west to the waiting automobile, the engine of which Hyland had kept running, and were driven away at a high rate of speed. A physician was immediately summoned to attend Adams' wounds. Three shots were found in his body—one bullet in the left breast about two inches below the nipple, near the heart, another penetrated the lower part of the abdomen, and the third struck the right hip. Adams died about thirty minutes after the shooting.

Hyland and the Thomasson boys drove west to the junction, as they had been directed, but finding no person there to meet them, they first proceeded north about two miles, then turned south, going to Dowell, where they met Newman, Mrs. Newman, Ritter and Ollie Potts in the other Chrysler automobile. The occupants of the two cars went to the roadhouse designated, taking with them various firearms, including two machine guns. The automobiles were placed in a garage. Newman and Ritter requested the proprietress of the roadhouse to prepare supper for Hyland and the Thomasson brothers and to shelter them until some person called for them during the night. Elmo Thomasson

was provided with a high-powered rifle, and the boys were instructed what to do if persons other than members of the Birger gang should appear. After supper Birger, Rone and Dungey arrived at the roadhouse, and Birger inquired for Hyland and the Thomasson boys. When Birger entered the room they occupied he said, "You surely did a neat job; that is one —————— we won't have to worry about any more," and he added that they had more work to do. Shortly thereafter Birger, Rone, Dungey, Hyland and the Thomasson brothers left in an automobile driven by Birger, taking with them a machine gun and high-powered rifles. They drove north to the junction, east to Christopher, back to the junction and south to Ward, where they stopped at a roadhouse for two hours. Leaving this house they drove south to Carbondale and thence east to Marion, where Birger asked the driver of the bus from St. Louis whether Carl Shelton had arrived. Proceeding east, Birger and his companions reached Shady Rest about midnight. Newman, Mrs. Newman, Ritter and Ollie Potts had arrived there somewhat earlier. Addressing them, Birger said, "We got the dough-bellied —————, didn't we?" Newman answered, "Yes; it was a clever trick to do." Birger took Hyland and the Thomasson boys aside, told them he understood Adams had been shot three times and divided $150 equally among them. Birger, Nurock and the Thomasson boys then drove to the Horning Hotel, in Harrisburg, where Nurock and Harry A. Thomasson signed the register under assumed names. The four men left the hotel about two o'clock in the morning and visited a cafe to which Newman, Mrs. Newman and Ollie Potts had gone. Nurock and Harry A. Thomasson soon returned to the hotel and retired. The next day Birger, Newman, Ritter and Harry A. Thomasson met at Birger's home in Harrisburg. Early in the morning of the 17th of December, Birger, Wooten and Harry A. Thomasson in a Buick coupe, and another man in a Ford sedan, drove to the garage at Dowell where the

mud-covered Chrysler automobile was stored. This car was towed by Birger to a field southwest of Dowell, the heater and battery were removed therefrom, a hole was shot in the gasoline tank and the car was saturated with gasoline and burned. The men then returned to Marion *via* Carbondale. The framework of the burned car was afterwards recovered. The car, it was discovered, had been sold by an automobile dealer in Carbondale and later was stolen from the owner. About the 8th of January, 1927, Shady Rest was destroyed by fire and explosives. Three charred human bodies, burned to such an extent that identification was impossible, were found in the ruins. Elmo Thomasson lived at Shady Rest when it was destroyed and he has not been seen since that time. The authorities were convinced that he died in the fire, and for that reason he was not indicted.

The substance of the prosecution's evidence, adduced from forty-five witnesses, is set forth in the foregoing statement. No evidence was offered by or in behalf of plaintiff in error or any of his co-defendants.

The first contention made by plaintiff in error is, that his petition for a change of venue from Franklin county was improperly denied. It was charged in the petition that from the time he was lodged in jail, guards armed with machine guns and other fire-arms were maintained, creating the impression in the public mind that these extreme measures were necessary; that constables and police officers in various parts of Franklin county had warned the inhabitants that plaintiff in error must be hanged; that the newspapers of the county were hostile to him and had published prejudicial articles, which had been read by persons who would be called for jury service; that because the State's attorney represented the 15,000 coal miners of the county, these miners, from whom jurors would be drawn, would be prejudiced against plaintiff in error; that members of the Shelton gang were constantly circulating vile

and abusive reports against him and that they would intimidate the jury, and that a conspiracy to hang him existed in Franklin county. The petition was supported by the affidavits of two of the attorneys for plaintiff in error. These affidavits were corroborative, to some extent, of allegations contained in the petition. One of the affiants stated that the opinion of the inhabitants of Franklin county, generally expressed, was that plaintiff in error should be hanged, and that in affiant's opinion plaintiff in error could not receive a fair trial in the county. The other affiant set forth that he had talked with many persons who had read various newspaper articles detrimental to plaintiff in error, and that he, the affiant, had learned that three Shelton brothers had intimidated persons who might become jurors and had created a local state of feeling prejudicial to plaintiff in error. A number of clippings from newspapers published in Franklin county were attached to the petition as exhibits. In these exhibits the activities of the Shelton and Birger gangs were related and crimes committed by them were discussed. The State's attorney filed a reply to the petition for a change of venue. In this reply he averred that the petition had not been filed at the first term of court at which the petitioner might have been heard; that the petitioner not only failed to show that the causes for a change of venue had come to his knowledge since that term, but that it affirmatively appeared from the exhibits that the facts alleged in the petition were known to him during that term. Eight persons, including the State's attorney and the sheriff, filed counter-affidavits, in each of which it was stated that in the opinion of the affiant no prejudice against plaintiff in error existed among the inhabitants of Franklin county and that he would not be denied a fair and impartial trial in that county. Certain of these affiants stated that they had discussed the murder of Adams with residents of the county; that these discussions disclosed no prejudice against plaintiff in error; that

gang warfare had existed in Franklin county only a short time, and that the Shelton brothers would have no influence upon the impending trial. The sheriff in his affidavit stated that a strong guard was placed about plaintiff in error because he had threatened to kill every person who attempted to arrest him.

The instant indictment was returned at the February term of the trial court, which continued in session until May 21, 1927. The court was convened for the May term on the 23d day of that month and the petition for a change of venue was filed on June 10, 1927. Section 25 of the "Act to revise the law in relation to change of venue," (Cahill's Stat. 1927, p. 2492; Smith's Stat. 1927, p. 2758,) provides: "No change of venue shall be granted after the first term at which the applicant might have been heard, unless he shall show that the causes for which a change is asked have arisen or come to his knowledge since the term at which the application might have been made." Application for a change of venue should have been made at the February term. There was no showing that knowledge of any cause therefor which was the basis of the petition first came to the petitioner after the conclusion of that term. On this ground, alone, the application might have been denied. (*People* v. *May*, 269 Ill. 417.) When the question is considered upon its merits it does not appear that, apart from the State's attorney and the sheriff, the persons who made the affidavits in behalf of the People were interested in the prosecution of plaintiff in error. Upon an application for a change of venue alleging that the inhabitants of the county are prejudiced against the defendant, the issue to be determined is not whether the evidentiary facts set forth in the petition are proved, but whether, upon the showing made, there is reasonable ground for fear that the alleged prejudice actually exists and that the defendant will not receive a fair and impartial trial. (*People* v. *Fricker*, 320 Ill. 495; *People* v. *Murphy*, 276 id. 304; *Jamison* v. *People*, 145

id. 357.)   Upon the petition and affidavits filed by plaintiff
in error and the traverse and counter-affidavits filed by the
prosecution, it did not appear that a prejudice existed in
the minds of the inhabitants of Franklin county sufficient
to raise a reasonable apprehension that plaintiff in error
would not receive a fair and impartial trial in that county.
Moreover, plaintiff in error experienced no difficulty in the
selection of the jury, for he exhausted only eight out of the
twenty peremptory challenges allowed him by law.   Each
of his co-defendants exercised even a lesser number of such
challenges.   Plaintiff in error was not compelled to accept
as a juror any person to whom he objected.   If he chose to
accept certain jurors when he was not required to do so he
cannot now complain.   (*People* v. *Fricker, supra.*)   The
trial court committed no error in denying the motion for
a change of venue.

It is next contended by plaintiff in error that the spe-
cial grand jury which found the indictment in the case at
bar was irregularly and unlawfully selected, and that in
consequence its presentments are void.   To sustain this con-
tention it is charged that before the order for the grand
jury was made the sheriff sent his deputies to summon
certain residents of various townships in Franklin county
to appear in court to serve as grand jurors and that a num-
ber of the persons so summoned were present in the court
room when the special grand jury was ordered;   that the
sheriff determined that these persons were qualified for
grand jury service prior to the entry of the order for the
special grand jury and the issuance of the venire therefor,
and that the actual selection of the grand jury was made
without process of law;   that the sheriff's return on the
process is silent in respect to the manner in which it was
executed, and that if the grand jurors were actually sum-
moned after the issuance of the venire they were selected
from the by-standers in the court room and not from the
body of the county, as commanded by the venire.

Section 19 of the act concerning jurors (Smith's Stat. 1927, p. 1681,) provides, among other things: "The judge of any court of record of competent jurisdiction may order a special venire to be issued for a grand jury at any time when he shall be of opinion that public justice requires it. The order for such venire shall be entered on the records of the court by the clerk thereof; and such clerk shall forthwith issue such venire under his hand and the seal of the court, and deliver the same to the sheriff, who shall execute the same by summoning, in the same manner now provided or that may hereafter be provided by law for summoning jurors, twenty-three persons, qualified by law, to constitute a grand jury. Such venire shall state the day on which such persons shall appear before the court." The residences of the twenty-three men selected as grand jurors were shown by the sheriff's return upon the venire. They came from ten of the twelve townships in Franklin county. Some of them had been previously notified by a deputy sheriff to appear at the court house, but they were formally summoned after they reached Benton, the county seat. The fact that they were summoned at the court house and not at their respective homes did not change their competency or qualifications to serve. It sufficiently appears that the grand jurors were selected from the body of the county. (*Fletcher* v. *People,* 81 Ill. 116.) With respect to the manner in which the venire was executed, it may be observed that the statute provides that a person may be summoned for grand jury service by reading the summons to him. (Cahill's Stat. 1927, chap. 78, secs. 11, 19, pp. 1551-1553; Smith's Stat. 1927, pp. 1679, 1681.) The return sets forth that the summons was executed as directed. There is nothing to show that the deputy sheriff did not read the summons to each of the persons served. Informality in the manner of summoning grand jurors is not fatal to the indictment unless the substantial rights of the accused person are prejudiced by the method pursued. (*Peo-*

*ple* v. *Wallace,* 303 Ill. 504.) To the same effect is *People* v. *Donaldson,* 255 Ill. 19. It is generally held that mere irregularities in impaneling a grand jury, not affecting the competency of any of the members, will not vitiate their action, and slight irregularities in the form of the writ or in making the return are not fatal. (28 Corpus Juris, 780-782.) So far as the selection of the grand jury is concerned, nothing prejudicial to the substantial rights of the plaintiff in error appears.

Complaint is made that the court denied the motion of plaintiff in error for a bill of particulars. It is unnecessary to recite evidentiary facts in an indictment but it is sufficient to state the ultimate facts. (Joyce on Indictments,— 2d ed.—sec. 316.) Each count of the indictment charged plaintiff in error and others jointly with the crime of murder. The crime was alleged with such certainty as to apprise plaintiff in error of the specific charge against him. A bill of particulars in a criminal case is not necessary where the indictment informs the defendant of the crime with which he is charged, sufficiently to enable him to prepare his defense. (*Gallagher* v. *People,* 211 Ill. 158; *People* v. *Smith,* 239 id. 91.) Whether the People shall be required to furnish a bill of particulars in a given case rests in the discretion of the trial court, and it is only in cases where it is clear that there has been an abuse of this discretion that the denial of a motion for such a bill is error. (*People* v. *Munday,* 280 Ill. 32; *People* v. *Poindexter,* 243 id. 68; *People* v. *Smith, supra; DuBois* v. *People,* 200 Ill. 157.) The motion for a bill of particulars in the instant case was in its nature a request for a disclosure of the evidence. There was no abuse of discretion in denying the motion. *People* v. *Munday, supra;* Joyce on Indictments, (2d ed.) sec. 325.

Plaintiff in error made a motion for a separate trial. The motion was denied, and it is insisted that the court's

ruling was prejudicially erroneous. Among the grounds set forth in the motion were, that, to injure plaintiff in error, Newman caused to be published in many newspapers a purported confession by himself implicating plaintiff in error in other crimes; that he had communicated with officers of the county and had aided them in procuring, and had caused Mrs. Newman to procure, false testimony against plaintiff in error; that he refused to confer with plaintiff in error and his attorneys for the purpose of preparing a proper defense; that he had made various statements which, while evidence against himself, would be incompetent as to plaintiff in error; that if they were tried jointly, Newman would endeavor to obtain a jury that would not give plaintiff in error a fair trial; that he would testify to false matters in order to convict plaintiff in error, and that their defenses were antagonistic. The State's attorney filed a reply to the motion, in which he denied that Newman or his wife had aided the officers of Franklin county in procuring evidence against plaintiff in error, or that any admission or confession by any defendant to be tried, implicating any other defendant, would be offered in evidence. The proceedings upon the trial clearly showed that the material charges made in the motion were unfounded. None of the defendants offered any evidence and no admission or confession by any defendant implicating another defendant in the crime charged was offered by the prosecution. The record shows that the attorneys for the respective defendants conferred together during the trial. The opening statements in behalf of Newman, Hyland and plaintiff in error were made after the prosecution had closed its case, and in none of these statements was anything said which indicated that the individual defenses were antagonistic. Persons jointly indicted are usually tried together. The motion for a separate trial in a criminal case is addressed to the court's discretion, and its action in denying the motion is not subject to review unless it clearly appears that there was an

abuse of that discretion. (*People* v. *Covitz*, 262 Ill. 514; *People* v. *Gukouski*, 250 id. 231; *Gillespie* v. *People*, 176 id. 238; *Doyle* v. *People*, 147 id. 394.) The court did not abuse its discretion in denying the motion for a separate trial.

It is insisted that the State's attorney, in the course of his closing argument to the jury, stated that portions of the evidence which he successively reviewed had not been denied or contradicted; that these statements were made for the purpose of directing the jury's attention to the failure of plaintiff in error to avail himself of his legal right to testify, and, consequently, that these remarks were extremely prejudicial to plaintiff in error. It is the right and the duty of the State's attorney to review the evidence and to discuss its weight. He may, in his argument, call the jury's attention to the fact that the testimony of witnesses for the prosecution has not been contradicted, even though the defendant, who is the only person who could contradict such testimony, has not testified. (*People* v. *Donahoe*, 279 Ill. 411.) In a criminal case, where there is no evidence whatever contradicting the case made by the People, a statement by the State's attorney that the evidence has not been contradicted is not an unwarranted reference to the failure of the defendant to testify. (*People* v. *Clement*, 285 Ill. 614; *People* v. *Paisley*, 299 id. 576; *People* v. *Miller*, 278 id. 490; *People* v. *Donaldson, supra.*) Moreover, at the request of plaintiff in error the court instructed the jury that although a defendant in a criminal case might testify in his own behalf, yet he was not obliged to do so; that his failure or neglect to testify created no presumption against him, and that the jury, in summing up the evidence in the cause, should wholly disregard the fact that the accused did not testify. The contention that the statements of the State's attorney that certain portions of the testimony had not been denied or contradicted were erroneous is without merit.

Plaintiff in error argues that the State's attorney should not have been permitted, in his closing argument, to read from the testimony taken on the trial. It appears that the State's attorney, in making his argument, refreshed his recollection from minutes of the evidence made by his stenographer. He did not read from a transcript of the evidence— a practice which was condemned in *People* v. *Willy,* 301 Ill. 307. The use made of the minutes violated no right of plaintiff in error.

Complaint is made of certain instructions given to the jury at the request of the prosecution. The twenty-ninth instruction is as follows:

"The court instructs the jury that the testimony of an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness. The testimony of an accomplice must be received with great caution, but if the testimony carries conviction and the jury are convinced of its truth, they should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense."

It is argued that the correct rule is that such testimony is open to grave suspicion, and that it is only when the jury are satisfied of its truth from a consideration of it with all the other facts and circumstances in the case that it should be accepted. The same instruction was approved in *People* v. *Rees,* 268 Ill. 585, and in *People* v. *Durand,* 321 id. 526. While the testimony of an accomplice must, as a matter of law, be received with suspicion and acted upon with great caution, it is nevertheless competent evidence, and a conviction may be sustained on such testimony, uncorroborated, if it is of such a character as to convince the jury, beyond a reasonable doubt, of the guilt of the accused. (*People* v. *Looney,* 324 Ill. 375; *People* v. *Maggio,* 324 id. 516.) The sixth instruction given at the request of plaintiff in error told the jury that they should subject the testimony of an accomplice to careful examination

329—24

in the light of all the other evidence in the case. The giving of the twenty-ninth instruction was not prejudicial to plaintiff in error.

The thirty-fourth instruction told the jury that they were the sole judges of the credibility of the witnesses, and after pointing out certain things to be considered in the performance of that duty, added the general clause, "and any circumstances that tend to shed light upon his credibility." The objection is that by the concluding clause of this instruction the jury might understand that they could consider circumstances not shown by the evidence. The jury were specifically told in one instruction that they could consider only the evidence which was introduced in the case. Admitting that the thirty-fourth instruction was subject to the technical objection that it did not limit the circumstances to be considered to those shown by the evidence, it was said in *People* v. *Thompson*, 274 Ill. 214: "It is inconceivable that this omission, in view of the other instructions given for the prosecution and the defense, could have misled the jury to understand they could consider circumstances not appearing in evidence, and there is no intimation that there were any circumstances which were or could have been considered by the jury outside of those shown by the testimony." Moreover, plaintiff in error cannot complain of the omission of this limitation because two instructions given at his request were subject to the same objection.

The thirty-fifth instruction was as follows:

"Circumstantial evidence in criminal cases is the proof of such facts and circumstances connected with or surrounding the commission of the crime charged as tend to show the guilt or innocence of the party charged, and if the facts and circumstances shown by the evidence in this case are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding the defendant guilty. The law demands a conviction wherever there is

sufficient legal evidence to show the defendant's guilt beyond a reasonable doubt, and circumstantial evidence is legal evidence."

There was evidence in this case of a circumstantial nature, hence it was proper to give an instruction upon that character of evidence. (*People* v. *Fricano,* 302 Ill. 287.) Proof of guilt, beyond a reasonable doubt, by circumstantial evidence would exclude belief in the innocence of the defendant. (*Schoolcraft* v. *People,* 117 Ill. 271.) The jury were told in other instructions that if they were not satisfied from the evidence, beyond a reasonable doubt, of the guilt of plaintiff in error they must find him not guilty. The thirty-fifth instruction could not be misleading when considered with the other instructions in the case.

The thirty-seventh instruction told the jury that a doubt, to justify an acquittal, must be reasonable and arise from "a candid and impartial investigation of all the evidence in the case," and unless the doubt was such that were a similar one interposed in the graver transactions of life it would cause a reasonable and prudent man to hesitate and pause, it was insufficient to authorize a verdict of not guilty. The use of the phrase, "from a candid and impartial investigation of all the evidence in the case," it is insisted, is confusing, for it is the jury's duty to weigh and consider and not to investigate. The word "consideration," rather than the word "investigation," would have expressed the jury's function. The word "investigation," however, has been used in instructions in the same or a similar connection, and such instructions are not on that account erroneous. *Moeck* v. *People,* 100 Ill. 242; *Miller* v. *People,* 39 id. 457.

The forty-second instruction was as follows:

"The jury are instructed that the rule requiring the jury to be satisfied of the guilt of the defendant from the evidence beyond a reasonable doubt in order to warrant a conviction is complied with if, taking the testimony all together, the jury are satisfied beyond a reasonable doubt that the

defendant is guilty. The reasonable doubt that the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case not necessary to constitute the crime charged."

In *People* v. *Cramer,* 298 Ill. 509, the concluding sentence of an instruction otherwise the same, read: "The reasonable doubt that the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case not material to the issue in the case." Such an instruction, it was there said, should not be given without defining the essential material facts constituting the crime with which the defendant was charged, but whether such an instruction would be ground for reversal might depend upon the state of the record, which might or might not raise an inference that the jury's view of the law with respect to the material elements of the offense was erroneous. Likewise in *People* v. *Johnson,* 317 Ill. 430, the last sentence of an instruction upon reasonable doubt read: "The reasonable doubt the jury is permitted to entertain must be as to the guilt of the accused on the whole of the evidence and not as to any particular fact in the case." We there said: "It is not correct to say that a reasonable doubt as to any particular fact in a case is not sufficient to justify an acquittal, without distinguishing between facts which are material and constitute a necessary element of the crime and those which are not so material and necessary." Numerous instructions were given to the jury. The instructions, taken together, correctly informed the jury in respect to the law upon the subject under consideration. The omission in the forty-second instruction does not, for that reason, require a reversal of the judgment. *People* v. *Murray,* 307 Ill. 343.

Finally, it is contended that the testimony which tended directly to establish the guilt of plaintiff in error was that of Harry A. Thomasson, an accomplice; that Thomasson

was unworthy of belief, and hence that the verdict is not supported by the evidence. Thomasson made a complete confession of the crime, and at the trial testified that he and his brother carried out the plot to kill Adams as devised by plaintiff in error, Newman and Ritter at Shady Rest on the previous evening. At points where the automobile driven by Hyland was stopped the occupants were recognized. There is ample corroboration of the shooting, and of Hyland's presence at the waiting automobile, by persons who passed Adams' house at the time. The movements of Birger from the time he met Hyland and the Thomasson brothers were shown by a number of witnesses. The note written by Ritter, which Elmo Thomasson gave Adams, the loose-leaf sheet from the register of the hotel at Harrisburg which showed the assumed names signed by Nurock and Harry A. Thomasson, and a hub-cap of a Chrysler automobile found at the place where the mud-covered Chrysler car driven by Hyland was burned, were introduced in evidence and corroborated Harry A. Thomasson. Birger's various threats to kill Adams were established by several witnesses. The evidence, both direct and circumstantial, amply shows that plaintiff in error directed the conspiracy to murder Adams from its inception and that he participated in the crime until it was consummated. No verdict other than one of guilty could properly have been returned by the jury.

The judgment of the circuit court of Franklin county is affirmed. The clerk of this court is directed to enter an order fixing the period between sunrise and sunset on Friday, the 13th day of April, 1928, as the time when the original sentence of death entered in the circuit court of Franklin county shall be executed. A certified copy of that order will be furnished by the clerk of this court to the sheriff of Franklin county. *Judgment affirmed.*