(No. 20370.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DELBERT B. COBB *et al.* Plaintiffs in Error.

*Opinion filed February 18, 1931.*

WALTER W. WILLIAMS, THURLOW G. LEWIS, and CARTER H. HARRISON, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, MARION M. HART, State's Attorney, MERRILL F. WEHMHOFF, and ROBERT E. HICKMAN, (MOSES PULVERMAN, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

The plaintiffs in error, Delbert B. Cobb and Ed P. Loden, (herein called defendants,) were found guilty of larceny by embezzlement by a jury in the circuit court of Franklin county at its February term, 1930. The case is here on a writ of error.

Lon Fox, Delbert B. Cobb and Ed P. Loden during 1927 were, respectively, the resident officers, to-wit, president, vice-president and secretary-treasurer of sub-district No. 9, district No. 12, of the United Mine Workers of America, an unincorporated fraternal beneficiary organization existing for the benefit of coal miners belonging to the association. Sub-district No. 9 embraced all of the local unions in Franklin county. In 1927 a strike, coupled with a prior slackness of employment at the mines, created some distress among the member miners of the local unions in the sub-district. At the biennial convention in May, 1927, presided over by Fox, the plight of the miners was discussed and cognizance taken of the fact that many of the families of the miners were suffering from want of food. The sub-district then had in excess of $50,000 of inactive funds on time deposits in various banks, which funds had not been set apart for any particular purpose. A proposition to use $50,000 of this money in purchasing groceries at wholesale by the resident officers was referred to a standing commit-

tee for solution and report to the convention. The committee reported as follows: "Having been instructed by this delegation to bring before you some idea regarding the distribution of the sub-district funds, your committee believes that the resident sub-district officers be empowered to the sum of fifty thousand dollars ($50,000) to purchase groceries wholesale, and that same to be distributed to all the local unions in this sub-district *per capita,* and that all local unions elect sufficient men to handle this situation." This report was adopted unanimously by the convention. Thereupon Loden, as secretary-treasurer, on June 7, 1927, concentrated $50,000 of the time deposits in one bank, the Union State Bank of West Frankfort, opening a checking account in the name of "Lon Fox, D. B. Cobb and Ed P. Loden, Sec.-Treas." Bernard Hampton, a local merchant of West Frankfort, was at this time president of that bank and was requested by the three officers to recommend some place to buy the groceries wholesale. Hampton named a brokerage firm at Springfield and brought about a meeting between one Kellner, a member of the firm, and the three officers. After negotiations, groceries were purchased through Kellner, to be paid for upon delivery at West Frankfort and other points in Franklin county. Kellner agreed to send a representative to receive payment at West Frankfort and to make a distribution of the groceries at the expense of the sub-district, as ordered by the three officers. Upon completion of arrangements, Cobb and Loden, by check, on June 7, 1927, transferred $2500 of the $50,000 in the Union State Bank to the account of the brokerage firm, which had also opened an account in the same bank. All of the $50,000 was checked out to the account of the brokerage firm before June 14, 1927, by six checks, No. 1 being signed by D. B. Cobb as vice-president and E. P. Loden as secretary-treasurer; No. 2 being signed by Lon Fox as president, D. B. Cobb as vice-president and E. P. Loden as secretary-treasurer, and Nos. 3, 4, 5 and 6 all being signed

by E. P. Loden as secretary-treasurer. These six checks aggregated $49,999.93 and were indorsed for the brokerage firm by C. J. Buhrer, its representative at West Frankfort. On June 14, 1927, Hampton called at the sub-district offices and gave to Loden a deposit slip of the Union State Bank for $3500 deposited to the account of Loden. He also left with Loden deposit slips showing deposits of $3500, each, to the accounts of Cobb and Fox, for delivery to them. Loden testified that Hampton told him at the time that this was a division of his commission on the grocery deal with Fox, Cobb and Loden and that he (Hampton) got $3000 as his share. The three men accepted these deposits and spent the money for their own personal use.

Kellner and Buhrer both testified that the amount of groceries actually purchased for the sub-district amounted to about $35,000. Buhrer said that at the request of the two defendants and Fox he furnished them with false invoices, which, including the expense of distribution, used up all of the $50,000 with the exception of seven cents; that upon the presentation of a false invoice to the three officers a check would be issued to the brokerage firm for the amount of the invoice. Buhrer would then take the check to the bank, deposit it in the brokerage firm account and pay off the draft which always accompanied a shipment of groceries. It was understood that such checks would each be in excess of the amount required to take up the respective sight drafts. After paying each draft Buhrer paid over the excess cash to Hampton, as he was directed to do by Fox, Cobb and Loden. The total amount of excess cash thus paid over to Hampton, according to Buhrer, was $15,000 or $16,000, all of which was paid to Hampton in currency. Hampton testified that Fox, Cobb and Loden told him to receive any money that Buhrer paid him, and that at different times Buhrer would pay money to him in the form of currency, the total amount of which he said

was only $10,500; that when the payments reached that sum he took the money from his safe and on June 13, 1927, deposited it in the Union State Bank, $3500 each to Loden, Fox and Cobb. He denied ever saying that he had received $3000 from Buhrer for his own benefit. Over two years later Cobb and Loden requested and secured an interview in Terre Haute, Indiana, with John L. Lewis, president of the United Mine Workers of America. At this interview on September 15, 1929, both Loden and Cobb admitted receiving $3500 as before stated and said that Hampton told Loden he had received $3000, and that the entire $50,000 appropriation for groceries was spent, of which about $34,-000 was spent for groceries and about $16,000 was used for the payment of commissions, including the amounts received by them. At their trial the two defendants did not deny making these admissions but did deny that they schemed or confederated with Buhrer, Hampton or others, or among themselves and with Fox, to divert any of the $50,000 from its intended purpose or to take and appropriate any part thereof for their own personal use. However, the jury found the defendants guilty as charged, and the trial court denied their motions for new trial and in arrest of judgment and sentenced them to the Southern Illinois Penitentiary.

The defendants make numerous assignments of error but only those assignments that are argued in their brief will be considered, since assignments of error not argued in briefs filed in this court are deemed to have been waived. *International Harvester Co.* v. *Industrial Board,* 282 Ill. 489; *People* v. *Brown,* 325 id. 307.

The only assignments of error preserved for review are: (1) That the statute under which the indictment is drawn is unconstitutional and void because it is in conflict with section 22 of article 4 of the State constitution; (2) that the trial court erred in amending the record at a term subsequent to that at which the indictment was found in order

to show that an indictment had been returned by the grand jury in open court; (3) that the court improperly refused a change of venue from the county on the ground of the prejudice of the inhabitants; (4) that the allegation in the indictment that the defendants had the custody of certain funds as officers of sub-district No. 9 was not sustained by the proof.

Considering these assignments of error in the order stated, we find that the defendants were indicted under that section of the Criminal Code which makes it an offense for any person who is a member and officer of any fraternal beneficiary society, corporation or association, or subordinate lodge thereof, to embezzle or fraudulently convert to his own use or take and secrete with intent so to do, any funds or property of such beneficiary society, corporation, association or subordinate lodge thereof which have come to his possession or are under his care by virtue of such office, without first obtaining the consent of the beneficiary society, corporation, association or subordinate lodge thereof, as the case may be. (Cahill's Stat. 1929, chap. 38, sec. 196.) The defendants argue that this statute made it a crime for an officer of a fraternal beneficiary society to misappropriate funds that came into his possession as such officer, the legislature taking away the former defense that, being a beneficial owner of a portion of such fund, the officer could not be prosecuted for embezzlement. The defendants urge that by singling out the officers and leaving all other members immune the legislature has made an arbitrary distinction. They further claim that the distinction made is all the more arbitrary because the responsibility as fixed by the statute fastens only to such officer in whose hands the funds repose, thereby eliminating all other officers from the operation of this statute except what they term fiscal agents, or, in common parlance, the treasurer of a society. Because of the limitation of application of the statute it is claimed that the legislature enacted unwarranted, arbitrary, unreasonable

legislation that is unconstitutional because it is special and not general in its application. We cannot agree with this contention. We can readily perceive that abundant reason could, and probably did, exist to cause the legislature to take cognizance of the fact that dishonest fiscal officers could steal from mutual beneficiary societies and go unpunished. This was a proper subject for the consideration of the legislature, and we cannot say that there is no reasonable basis for the distinction found in the act. The act applies only to those officers who by virtue of their office are placed in a position where they are the custodians of funds of the society. There is nothing in the act which makes it special in the sense that it applies to only limited portions of people within its scope, for it applies uniformly to all member officers of mutual beneficiary societies, etc., in possession of funds by virtue of their office, and is therefore a general law. (*Hawthorn* v. *People,* 109 Ill. 302.) The distinction singling out fiscal officers is not arbitrary but rests upon good reason of public policy growing out of the conditions created by dishonest fiscal officers of mutual beneficiary societies. The general rule is that classification as determined by the legislature will suffice as a basis for legislation if such classification is based on a rational difference of situation or condition found to exist in the persons or facts upon which the classification rests. (*Greene* v. *Fish Furniture Co.* 272 Ill. 148; *People* v. *Nellis,* 249 id. 12.) A law is general not because it embraces all of the governed but because it may embrace all when they are similarly situated and come within its provisions. (*People* v. *Kaelber,* 253 Ill. 552.) Whether the laws are general or special does not depend upon the number of those who are within the scope of their operation. They are general and uniform not because they operate upon every person in the State, for they do not, but because every person who is brought within the relations and circumstances pro-

vided for is affected by the law. (*People* v. *Stitt,* 280 Ill. 553.) The constitutional provision does not mean that the same rule shall apply to every person in the State under all circumstances but only under substantially the same circumstances, and laws may be valid though operating only upon particular persons or classes if there is a valid reason for such particular operation and a substantial distinction is made. (*Springfield Gas Co.* v. *City of Springfield,* 292 Ill. 236; *Casparis Stone Co.* v. *Industrial Board,* 278 id. 77.) The provisions of the penal statute under which the indictment was returned against the defendants in this case have a reasonable basis, create no arbitrary distinctions or classifications and are not in conflict with section 22 of article 4 of the State constitution.

Considering now the second assignment of error, it appears that the indictment was returned during the September, 1929, term and was continued by operation of law. At the November, 1929, term the cause was again continued by operation of law. The defendants at the February, 1930, term moved to quash the indictment because the record did not show that the grand jury had returned the indictment into open court. Application was made by the People to amend the record to show that the indictments were returned into open court. The court heard oral and documentary evidence and amended the record *nunc pro tunc.* This was proper under authority of *People* v. *Knight,* 308 Ill. 182. On this point the People introduced thirty-one indictments found and returned into open court by the grand jury at the September, 1929, term, including the indictment in this case. Each indictment showed the signature of the foreman of the grand jury and the file-mark of the clerk of the court. The evidence showed that the file-mark was put upon the indictments by the clerk, the docket sheets on the judge's docket were prepared, and the indictments were each given a number. The judge entered minutes on his docket fixing the bail of each of defendants

in the respective indictments. All of the above was done on the day that all the indictments were returned into open court and constituted official memoranda upon which an amendment to the record can be made. The record in a criminal case may be amended after the term at which it is made has elapsed, by an order of court entered *nunc pro tunc,* when by reason of a clerical misprision it does not speak the truth. (*Tynan* v. *Weinhard,* 153 Ill. 598; *Hubbard* v. *People,* 197 id. 15; *May* v. *People,* 92 id. 343.) The oral testimony of the deputy clerk and of the foreman of the grand jury was proper to explain the making and keeping of the official or quasi-official memoranda or memorials. *May* v. *People, supra; Knefel* v. *People,* 187 Ill. 212.

The defendants further contend that they were wrongfully deprived of a change of venue. This contention does not have merit, as they did not apply for a change of venue at the first term at which application might have been heard thereon. The defendants were indicted at the September, 1929, term but made no application for change of venue at that term or at the succeeding November term but first applied for it at the February, 1930, term, after their motion to quash the indictment had been denied. Their application was made to the second term after their indictment, and shows on its face that the ground upon which the change was asked came to applicants' knowledge in time to apply therefor at a former term. It was therefore properly denied. (*People* v. *Birger,* 329 Ill. 352; Smith's Stat. 1929, chap. 146, par. 25; *People* v. *May,* 269 Ill. 417.) The granting of a change of venue based upon the prejudice of the inhabitants of the county rests in the sound discretion of the court. Circumstances, the existence of which the defendants say caused the people of the county to be prejudiced against them, are shown to have existed as long as eight years prior to the February, 1930, term, when the motion was made. A meeting at which it was

alleged defendant Cobb was assaulted is shown to have occurred nearly five years before the filing of the motion for change of venue. Articles appearing in a communistic newspaper of limited circulation in the county not later than 1925 cannot be said to have prejudiced some of the inhabitants of the county in 1930. A labor contract made in 1927 is cited as creating ill-will, and a killing in 1928 after a communistic meeting, when the killing was not clearly shown to be the aftermath of labor troubles. No showing is made that all of these facts and circumstances were not in the knowledge of the defendants at the September, 1929, term. If the defendants, both officially active for years in miners' affairs, did not know of the events, surely they were not of enough moment to create prejudice among the inhabitants of the county against them. From a review of the eighty affidavits in support of and the one hundred and fifty-five affidavits against the motion, we believe no prejudice was shown which could have prevented the defendants from receiving a fair and impartial trial. Further, it appears that the defendants did not exercise all of their peremptory challenges, so they cannot complain now that they did not have a fair and impartial jury. (*People v. Birger, supra.*) Since the application and supporting affidavits failed to show causes for a change of venue to have arisen since the term when application might first have been made, the trial court did not err in refusing to grant the change.

As a fourth assignment of error the defendants seek a reversal upon the theory that the penal statute under which they were indicted cannot apply to them because, as they allege, the $50,000 was held and used by them not as officers of a fraternal beneficiary society but by the three of them as a special committee of sub-district No. 9. They seek to establish themselves as ordinary members of the society, divested of official character and entrusted as a committee of three with special funds to be spent for a spe-

cial purpose. The action of the biennial convention appropriating the $50,000 for groceries instructed the "resident officers" to purchase the groceries. Fox, Cobb and Loden were then the three resident officers. Loden, at the time he concentrated the scattered time deposits in one account in one bank, did not deposit the account in the names of Fox, Cobb and Loden as a special committee. At no place does the record show that these men who had the money ever considered themselves holding it as a special committee and not as officers. Neither Hayes, the bank cashier, nor Hampton, Kellner or Buhrer, ever said he treated with the three as a special committee. To the contrary, check No. 2, dated June 9, 1927, for $20,065, payable to the brokerage firm, was signed "Lon Fox, president, D. B. Cobb, vice-pres. and E. P. Loden, sec.-treas." Check No. 1 on account dated June 7, 1927, for $2500, payable to the brokerage firm, was signed "D. B. Cobb, vice-pres. E. P. Loden, sec.-treas." The other four checks were signed "Loden, sec.-treas." without the signatures of the other officers or either of them. The only evidence as to the three holding as a special committee is their own story unsupported by any other evidence, oral or documentary. Even in their statements to John L. Lewis and others at Terre Haute, where Cobb and Loden told of the purchase of groceries, the defendants did not allude to themselves as a special committee. The evidence was sufficient to warrant the jury in believing that the allegations of the indictment charging that the defendants received the money as the resident officers of sub-district No. 9 were amply established. The defendants, as officers of a fraternal beneficiary society, come fully within the circumstances covered by the provisions of the penal statute under which they were indicted.

The judgment of the circuit court of Franklin county will therefore be affirmed.                 *Judgment affirmed.*