(No. 14142.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HERBERT PRENTICE CRANE, JR., Plaintiff in Error.

*Opinion filed February 22, 1922.*

1. CRIMINAL LAW—*when identification of defendant is entitled to little weight.* Where one under arrest is brought alone before a prosecuting witness for the purpose of identification and the witness knows that the party arrested is to be presented for that purpose, an identification under such circumstances cannot be given the same weight and credibility as where the witness picks out the accused from a number of unknown persons.

2. SAME—*civilian who takes active part in arrest and prosecution may be cross-examined as to his authority.* A civilian whom the accused at the time of his arrest was led to believe was a police lieutenant, and who took an active part in the arrest and prosecution and who posed as an officer in obtaining an alleged confession concerning which he was permitted to testify, may be cross-examined as to his occupation and as to his authority to act as an officer.

3. SAME—*statute concerning crime of taking indecent liberties defines two separate offenses.* The commission of a crime and the attempt to commit the same are distinct offenses, and the statute providing for punishment of anyone "who shall take, or attempt to take," indecent liberties with a child defines not only the crime of taking indecent liberties but also the attempt to commit the crime, which is a separate offense.

4. SAME—*when instruction in language of statute defining two crimes is erroneous.* An instruction in the language of the statute defining the crime of taking indecent liberties with a child and also the attempt to commit said crime is erroneous, where it closes with the statement that the offense so defined in the statute is the offense with which defendant is charged in a certain count of the indictment, which charges only the crime itself and not the attempt.

FARMER and THOMPSON, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES M. THOMSON, Judge, presiding.

FREDERICK A. BANGS, and GROVER C. NIEMEYER, (WILLIAM S. FORREST, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, HENRY T. CHACE, CLYDE C. FISHER, and THOMAS J. PEDEN, of counsel,) for the People.

Mr. CHIEF JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was indicted in the criminal court of Cook county on a charge of taking indecent liberties with Louise Sturm, a child of the age of thirteen years. The second count of the indictment charged attempted rape, and the third count charged contributing to the delinquency of said child. The third count was dismissed, and on trial the defendant was found guilty under the first count, and he brings the record of his conviction here for review.

Numerous errors are assigned. The ones principally argued here are, that the verdict is not supported by the evidence; that the court erred in giving certain instructions and refusing others; in admitting certain evidence; and in limiting the cross-examination of certain of the People's witnesses.

The People's evidence not controverted is, that on January 26, 1921, Louise Sturm, the complaining witness, and Marie Fischer, a girl about the age of the complaining witness, were attacked by a man in Lincoln Park between half-past five and six in the evening; that he seized Louise, threw her upon the ground and attempted to raise her dress, lying upon her; that he put his hand in her mouth to prevent her screaming and that she bit him; that he then put two fingers down her throat; that she thought he was on her about three minutes, when he got up and ran away; that he did nothing further than thus detailed, except to talk to her in a quiet tone of voice. She got to her feet and ran in the opposite direction and met a woman, who took her to an officer near the park. The other girl, who had run away at the time of the assault, found a police-

man, and with him went back to the place where the as-
sault occurred, which was near the Grant monument, and
found Louise's skates and cap. They started for the police
station and met Louise, whose face was scratched and bleed-
ing. These girls described the assailant as having dark skin,
thick lips and dark eyes, and expressed the opinion that he
might be an Italian. The prosecuting witness further de-
scribed the assailant as having had on a blue suit, a sort
of brown cap, a washed-out blue working shirt with a soft
white collar, wrinkled and dirty, and that he had on no
necktie or overcoat; that he was about 5 feet 8 inches in
height, between thirty and thirty-five years of age and of
medium weight. The Fischer girl described the man as be-
ing dark, with thick lips and big eyes. She could not tell
whether he was tall or short but said he was fat. She did
not know whether he wore a brown or blue suit but that
he had no overcoat. Two boys, William Briggs and Har-
vey Witke, saw the attack, and according to their testi-
mony were within ten feet of the assailant. Both testified
to the effect that the man was short and fat. The girls
gave the police a description of the assailant and were the
next day called to the police station by the police, who in-
formed them that a suspect had been arrested. As they
failed to identify him he was released. On the evening
of the next day, John Printup, a reporter on the *Herald-
Examiner* newspaper, called at the homes of the girls and
showed them two photographs, which the girls testified they
recognized as pictures of the assailant. Printup, with these
girls and their mothers, went to a near by drug store, where
Printup left them. He later returned in a cab and took
them to the Halsted street police station, where they re-
mained until police officers Mueller and Jacob appeared with
the defendant. It is also undisputed that Printup, Muel-
ler, Jacob and a man named Kessel went to an apartment
building about a half-block from Lincoln Park, where the
defendant resided, on the evening of January 27. Mueller,

Jacob and Printup were admitted into the apartment of the defendant while Kessel remained on the ground in the rear of the building, for reasons not disclosed by the record. The defendant was told by Mueller that the lieutenant of police wanted to see him about a matter at the station. Defendant said he wished to call his attorney, but Mueller told him that would be unnecessary; that he could do that after he reached the station. Defendant thereupon went with Mueller and Jacob, but Kessel, it appears from the evidence, did not but went in a taxicab with Printup, who drove to the drug store, and, taking the two girls and their mothers, went to the police station, where the defendant was brought before them for identification.

This, in general, is the uncontroverted evidence as to what occurred. Up to this point there appears to be no dispute. The evidence as to what was said and done thereafter is sharply in conflict. The complaining witness testified that she recognized the defendant at the police station as the man who assaulted her, but both girls testified that they said nothing in the defendant's presence when they saw him there. The two police officers and Printup and Kessel testified that the girls, in the presence of the defendant, said that the defendant was the man. Printup also testified that one of the girls said that she could tell him by his thick lips, dark complexion and facial expression. The Fischer girl testified on the preliminary hearing that she told Louise that she (Marie) was not sure that he was the man, but that if she (Louise) said he was she was better able to tell. On the trial the Fischer girl did not remember having so testified on the preliminary hearing, but the court reporter who took the testimony at that hearing testified from his notes that such was her testimony. Mueller testified on the trial that Louise pointed her finger at the defendant and said, "That's the man," and that Marie also said he was the man. It appears that he testified at the preliminary hearing that at the police station, in the

presence of the defendant, he asked the complaining witness if this was the man who assaulted her, and that she replied, "That is the man that is in the picture here." Kessel testified that the girls, in the defendant's presence at the police station, after being told to be sure before they made an identification of defendant, replied, "Yes, that's him." The prosecuting witness testified that when she saw the defendant at the police station he had on the same collar that he had on the night before; that it was a soft collar, dirtied and wrinkled; that the defendant was the only person in the squad-room that she had not seen before. This testimony as to defendant's collar is contradicted by the testimony of the defendant and two other witnesses, who state that the collar worn by the defendant on the evening of January 26 was not soft but was a white, stiff, turn-over collar.

The defendant testified that he was thirty-eight years of age at the time of the trial; that he was 5 feet 9¾ inches in height in his stocking feet and weighed 162 pounds when he went into the army; that his height and weight were the same at the time of the trial. He denied ever having seen the girls previous to the occasion of meeting them at the police station, and stated that they said nothing in his presence indicating that they identified him as the assailant.

The whereabouts of the defendant during the day and evening of January 26 was detailed in the testimony of Mrs. Sarah Frizell, in whose apartment the defendant roomed, and Mrs. Margaret Frisbie, who was visiting Mrs. Frizell on that day. These women both testified that the defendant remained in the house from noon on January 26 until 7:30 that evening, with the exception of about ten minutes shortly after luncheon, when he left the house for a walk. Mrs. Frizell testified that she remained at home all the afternoon until about 5:00 P. M., when she went to a near by store to do some marketing, returning about 5:20; that when she left the house the defendant was in the bath-room

taking a bath; that she had seen him go into the bath-room wearing his bath robe; that she tapped on the door and spoke to him before going out, and upon returning spoke to him again in the same manner; that in both instances he was in the bath-room and answered her. These women both testified that the defendant, together with a Mr. Killian, a brother of Mrs. Frizell, was in Mrs. Frizell's home when the women went to church, about 7:30 that evening, and when they returned, about 9:30. Mrs. Frisbie, who was in the apartment while Mrs. Frizell went to market, testified that the defendant did not leave the building during the absence of Mrs. Frizell. The defendant testified that he was not away from the building except for about ten minutes in the early afternoon, about 2:30. The record shows that Killian was in Texas on business and had not returned at the time of the trial. Both these women testified that on January 26 the defendant wore a brown striped suit, a white shirt with blue pin-stripes about an eighth of an inch apart, a stiff turn-over collar and a necktie, and that he wore a green Fedora hat. Mrs. Frizell, with whom the defendant had made his home for some time, testified that she had taken care of his laundry and wardrobe. Both she and the defendant testified that he did not own or have on January 26, or at any time near then, a blue suit, a blue workingman's shirt, a brown cap, or any detached soft collars of any color. These witnesses testified at the preliminary hearing and at the trial, and so far as the record shows, no attempt was made to impeach their testimony.

William Briggs and Harvey Witke, both of whom saw the assault, described the assailant as being short and heavy-set. They said it was dark but the lights were lit. They also testified that the defendant looked too tall to be the man, and both testified that the defendant was not the assailant. An officer of the juvenile court testified in rebuttal to the testimony of Briggs and Witke that their reputation for truth and veracity was not good, though he did not say

that he was acquainted with such reputation in the neighborhood in which the boys resided. The evidence does show that these boys, shortly after the assault, searched the park and neighborhood, with the police, in an endeavor to find the assailant.

It will be seen that the identification of the defendant was an important issue in the case. None of the State's witnesses testified to ever having seen the defendant before, and where one under arrest is brought alone before persons who are present for the purpose of identifying an assailant and who know that the person arrested is to be brought before them for identification, it is not unlikely that such surrounding circumstances might influence one who seeks to identify an assailant. Certain it is that such an identification cannot be given the same weight and credibility as where the witness had picked out the assailant from a number of persons unknown to her. This fact, together with the denial of the defendant and the testimony of Mrs. Frizell and Mrs. Frisbie, which, if true, makes it impossible that the defendant should have been the guilty party, requires that the evidence concerning identification of the defendant should be carefully weighed and that the record should be free from prejudicial error.

The State's witness Kessel testified that after the defendant had been taken before the girls in the police station, he, Jacob and Printup went with the defendant from the squad-room to the lieutenant's office, where the defendant declined to talk to anyone but him; that he told Mueller, Jacob and Printup to leave, and that after they had left him alone with the defendant, he (Kessel) said to the defendant that the girls identified him, to which the defendant replied "yes;" that after talking about other subjects he asked the defendant why he stopped the girls, and that he replied that they looked so pretty he just wanted to kiss them; that he did it and was disgusted with it, and that he would give Kessel $50 then, $500 the following day,

and $1000 when his father returned from New York, if he would release him. Mueller testified that he, Jacob and Printup stood at the doors which opened into the lieutenant's room and that he heard the defendant say that he would give Kessel $50 then and $500 the next morning. Jacob testified Kessel told him, in the presence of the defendant, that the defendant had offered him (Kessel) $500, and that the defendant did not deny it. He also testified that he heard the defendant tell Kessel he would give him $500. He testified that was the only amount mentioned in the conversation. It appears that on the preliminary hearing Kessel testified that the defendant had offered to give him $50 then and $500 the following day, but he made no mention of an offer to give him $1000 later. The defendant denied any such conversation but testified that he was left alone with Kessel in the lieutenant's office, and that after some conversation on travel and athletics Kessel beckoned him over to the desk at which he was seated, and, producing a piece of paper containing writing, said to him that if he (the defendant) would sign that paper as a confession and would get Kessel $1000 in the morning from the defendant's father, who had plenty of money, he (Kessel) would bluff the children and quiet the whole thing and the defendant would never hear any more about it; that he (the defendant) replied that he never saw either child before and would not stand for blackmail; that shortly thereafter he was locked up in a cell.

It appears from Kessel's testimony that he was not a police officer but that he belonged to what he called the department of constabulary for prevention of crime, apprehension of horse and auto thieves. There is nothing in the record to disclose why Kessel was represented to the defendant as lieutenant of police. It is very evident from the record that he was not a member of the police force. The record shows that when the plainclothes officers, Mueller and Jacob, went to the apartment of the defendant they

told him that the lieutenant wanted to see him at the police station; that Kessel, though he went to the apartment with the officers, did not appear in the presence of the defendant until after the party arrived at the police station, and a fair inference from what occurred there, as shown by the testimony of the witnesses as to the manner in which the defendant addressed Kessel, is that he understood that Kessel was a lieutenant of police. There is nothing in the record to disclose why this proceeding should not have been before the regular police lieutenant further than to indicate that he was not present that evening, but we are not apprised as to why the identity of Kessel was not made known to the defendant. Kessel's reputation for truth and veracity was attacked by several witnesses, who, so far as the record shows, were disinterested, who testified to having known him at the time he was employed as floorwalker in the Marshall Field department store, and who stated that his reputation for truth and veracity was bad and that they would not believe him under oath. No attempt was made to counteract this testimony. It was sought on cross-examination of Kessel to inquire as to what his business was and what authority he had to act as an officer in Cook county; also whether or not he was a salaried officer as inspector of constabulary and recruiting officer, as he designated himself in his testimony. This cross-examination was objected to and the objection was sustained by the court, and it is urged that such was error. We are of the opinion that it was error on the part of the trial court to refuse to permit the cross-examination of Kessel concerning his own identity, and what authority he, as a member of the society for the prevention of horse-stealing, had in the premises. The actions of Kessel in this matter are, to say the least, unusual. His testimony is attacked by several witnesses as being unworthy.

It will be seen from what has been stated that the guilt of the defendant was not proved in such a clear and satis-

302—15

factory manner that this court can say that errors in the record are not sufficient to warrant a reversal unless highly prejudicial. We are of opinion that in order to sustain the verdict in this case the record should be free from prejudicial error.

Plaintiff in error complains of the fourth instruction, which purports to set out the statute concerning the offense charged against him and is as follows:

"The court instructs the jury, in the language of the statute, that any person of the age of seventeen years and upwards, who shall take, or attempt to take, any immoral, improper or indecent liberties with any child of either sex, under the age of fifteen years, with the intent of arousing, appealing to or gratifying the lust or passions or sexual desires, either of such person or such child, or of both such person and such child, or shall commit, or attempt to commit any lewd or lascivious act, upon or with the body, or any part or member thereof, of such child, with the intent of arousing, appealing to or gratifying the lust or passions or sexual desires, either of such person or such child, or of both such person and such child, or any such person who shall take any such child, or shall entice, allure or persuade any such child to any place whatever for the purpose of taking any such immoral, improper or indecent liberties with such child, with such intent, of committing any such lewd or lascivious act upon or with the body or any part or members thereof, of such child with such intent, shall be imprisoned in the penitentiary not less than one year nor more than twenty years. This is the offense charged in the first count of the indictment."

The basis of the objection is, that while the indictment contained one count charging the taking of indecent liberties with the complaining witness there was no count charging an attempt to take indecent liberties with her; that the statute defined more than one crime, and that the instruction, closing, as it did, with the sentence, "This is the of-

fense charged in the first count of the indictment," gave the jury to understand that if the evidence showed but a mere attempt on the part of the defendant to take indecent liberties with the complaining witness such was sufficient to warrant his conviction under the only count in the indictment charging the act of taking indecent liberties. It is the rule in this State that the commission of a crime, and the attempt to commit the same, are separate and distinct offenses. (*Goodhue* v. *People,* 94 Ill. 37; *Graham* v. *People,* 181 id. 477.) The statute under which this prosecution was brought defines more than one crime. It provides that one who shall take any immoral, improper or indecent liberties with any child of either sex under the age of fifteen years with the intent there specified shall be imprisoned in the penitentiary not less than one nor more than twenty years, and also provides that if such person shall attempt to take such indecent liberties with such child he shall be imprisoned in the penitentiary for not less than one nor more than twenty years. Under the instruction given, if the jury thought that the evidence showed an attempt to take indecent liberties but that it did not show the accomplishment of the crime, they might nevertheless have felt justified, under such instruction, in returning a verdict of guilty under a charge of taking indecent liberties though the proof showed an attempt, only. Counsel for the State argue that it is not error to give an instruction in the language of the statute. This is sometimes true, but where the statute defines more than one crime, as is the case in the section referred to, such rule cannot apply. The contemplation of the law is that the jury shall be instructed only concerning the crime of which the defendant stands charged, and it is not a sufficient answer to say that the instruction is in substantially the language of the statute. (*People* v. *Jones,* 263 Ill. 564.) Without discussing further the testimony which is in this opinion set out pertaining to the

crime charged, we are of the opinion that the giving of this instruction was prejudicial error.

Other instructions were refused which told the jury that the society to which the witness Kessel testified he belonged was not an organization provided for by the statute as a police organization or one having police authority. In view of the rulings of the court limiting the cross-examination of Kessel concerning his identity and business these instructions should have been given. The question probably will not arise on another trial, however. The judgment must be reversed for other reasons, and we are not inclined to hold the refusal to give such instructions was, of itself, reversible error.

For the errors herein referred to, the judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

FARMER and THOMPSON, JJ., dissenting.