(No. 18911.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* AMANTE RONGETTI, Plaintiff in Error.

*Opinion filed October 25, 1928.*

FARMER, J., dissenting.

WM. SCOTT STEWART, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROY D. JOHNSON, (EDWARD E. WILSON, H. S. DITCHBURNE, and C. A. BELLOWS, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was found guilty by a jury in the criminal court of Cook county of murder by means of abortion and sentenced to death. He brings the cause here for review, assigning numerous errors, the principal of which are: (1) That the court, on motion of the State's attorney, advanced the cause, thus preventing plaintiff in error's counsel from preparing for trial; (2) the conduct of the trial judge was prejudicial; (3) the admission of incompetent evidence and refusal to admit competent evidence; (4) the court erred in giving and refusing instructions; and (5) variance between the indictment and the proof.

The indictment consists of two counts. The first count charges that on the 17th day of November, 1927, plaintiff in error made an assault upon Loretta J. Enders with a certain instrument, "a more particular description of which is to the grand jurors unknown," Loretta J. Enders being then and there pregnant with child; that by means of said instrument plaintiff in error caused the abortion and miscarriage of Loretta J. Enders, such not being then and there necessary for the preservation of her life, and that on the 11th day of December, 1927, she died, by means of which

plaintiff in error is declared guilty of murder. The second count charges an abortion by some means and devices a more particular description of which is to the grand jurors unknown, which abortion and miscarriage were not for the preservation of the life of Loretta J. Enders, which plaintiff in error then and there well knew; that by reason of such abortion and miscarriage she on the 11th day of December, 1927, died, and that plaintiff in error is therefore guilty of murder. A motion to quash the indictment was overruled and a plea of not guilty was entered.

Plaintiff in error was a regularly licensed physician and surgeon practicing in the city of Chicago. He conducted what is known as the Ashland Boulevard Hospital, located in that city. The hospital has facilities for about twenty-five patients. The testimony for the People tends to show that Loretta J. Enders, a single girl, was taken to the hospital of plaintiff in error on November 14, 1927, by William Cozzi and introduced to plaintiff in error as his wife. Cozzi had stated to the doctor that he was a dental student and that they could not afford to have a child, and plaintiff in error suggested that he bring his wife in for an examination. Cozzi testified that when plaintiff in error examined the deceased he said it was a bad case and would cost $500; that the witness told him he could not pay that amount; that he paid $100 and agreed to pay $50 at the end of the month and $25 at the end of each month until $250 was paid; that he actually paid $175 before the death of the girl.

Loraine Irwin, a witness on behalf of the People, testified that she began her employment in the hospital of plaintiff in error on the 15th day of November, 1927, as superintendent of nurses; that on that day she saw the deceased in the operating room; that plaintiff in error and Hazel Reed were also present; that the deceased was on the operating table; that she saw the doctor pick up a rubber catheter and a speculum; that the patient was not given an anæsthetic; that the witness did not know what

was done, as she was holding the hands of the patient; that she asked plaintiff in error the length of time the deceased was pregnant, and he told her it was about two or three months; that he said an abortion was necessary as she had two social diseases and was diabetic and there was an infection of gonorrhea; that she saw the patient two days afterward, in her room; that Hazel Reed was present at the time; that at that time she saw on the bed a fœtus; that Hazel Reed put it into a small basin; that this was early in the morning, and she returned to bed and gave directions to call plaintiff in error, but she did not know whether he was called; that plaintiff in error first told her to put the fœtus in a specimen jar and later told her to have it burned, which she refused to do; that he told Hazel Reed to take it, and she said she was busy, and that the last time she saw it a probation nurse was taking it through the hall; that she went down-stairs. This witness also stated that she was later present in the operating room with Hazel Reed and plaintiff in error when the latter performed a curettement; that she could not understand why the patient's temperature persisted and she asked plaintiff in error about it, and he said it was probably because of a gonococcus infection which she had; that on another occasion she asked him why, if he thought the patient had pus tubes, he did not operate; that he replied the people hadn't paid their bill and he would wait until he got the money; that plaintiff in error said she was not dangerous; that witness frequently discussed an operation with plaintiff in error. This witness stated she was not present at the time the deceased was received into the hospital.

Hazel Reed, called by the State, stated that she was employed in the hospital at the time Loretta Enders was admitted; that it was in the evening, shortly after dinner, in the middle of November; that at the time she was admitted to the hospital she was not suffering from a hemorrhage and was not wearing a perineal pad; that she did not know

of any examination being made of her on the night of her arrival; that the following day she was taken to the operating room, and there were present Loraine Irwin, plaintiff in error and the witness; that the patient was put on the operating table and prepared for surgery; that plaintiff in error inserted a vaginal speculum and picked up some instrument with which he broke the water bag; that a large quantity of water flowed; that he then inserted a rubber tube about the thickness of the witness' thumb; that it was double and projected from the uterus; that it was left there and the patient returned to bed; that plaintiff in error was asked why it was necessary to perform this abortion, and he replied that the patient had syphilis and gonorrhea, was diabetic, and was two or three months pregnant; that she saw the patient a few moments after she was removed to her room and that she was vomiting; that she was allowed up the next day; that about four o'clock in the morning of the 17th the witness was called downstairs by Mabel Moon, the night nurse; that she went to the patient's room and saw a fœtus lying in the bed with the umbilical cord still attached; that she cut it off, using a pair of scissors and forceps. In answer to a question whether plaintiff in error was called, she stated that she asked that he be called and that she had a report that he was called. Counsel for plaintiff in error moved to strike out the latter answer, but the court overruled the objection. The witness testified that when she arrived in the room she saw signs of life in the fœtus—that it was gasping; that after life became extinct it was put in a bed-pan and taken to the bath-room; that the rubber tube which had been inserted in the patient's uterus was lying in the bed at that time. This witness also testified that she had a conversation with plaintiff in error in which she asked him why, if he thought the patient had a perforation, he didn't operate, and that he replied, "They haven't any money." The witness also testified that plaintiff in error told her

that the chart for the first two days during which the deceased was at the hospital had been lost, and witness was asked to make a copy, which she did; that plaintiff in error told her what to put on the chart; that it was similar to what was on the original chart, and that she wrote the chart at plaintiff in error's dictation.

Frances Housler was called as a witness, and testified, over the objection of counsel for plaintiff in error, concerning three other women who came to plaintiff in error's hospital for abortions. The testimony as to one of these cases was stricken out, as it showed that the witness did not see anything done with regard to that patient. The name of this witness was given counsel during the presentation of the State's case, and plaintiff in error objected to the testimony of the witness on the ground that defendant had had no notice that any effort would be made to prove other abortions, and that while he had talked with the witness her answers were evasive. He asked that the court examine the witness out of the presence of the jury and determine what she would testify to and that counsel be given an opportunity to meet her testimony. These motions were denied.

The testimony of Dr. Samuel S. Epstein, a witness for the People, was to the effect that he made an examination of the body of the deceased. From this examination he gave the opinion that death was caused by septic peritonitis following an abortion; that he found no necessity for such abortion from an examination of the body; that he examined the uterus and found that the upper portion of it had a perforation; that the perforation was ante-mortem, and gave as his reason for that conclusion that there was evidence of scar tissue around the perforation. This witness removed the uterus and Fallopian tubes but did not examine them microscopically. They were not submitted to the examination of any other witness and were not accounted for on the trial. The testimony of other physicians introduced as experts, who examined the body, was to the ef-

fect that it contained no evidence of syphilis, gonorrhea or diabetes.

Angeline Kemp, mother of the deceased, was called as a witness on behalf of the People. She was permitted to testify, over the objection of counsel for plaintiff in error, that she had thirteen children, five of whom were younger than the deceased; that she saw her daughter Loretta on the 13th day of November; that she was at home and was in good health; that on the morning of Monday, the 14th of November, before witness left home to go to work, she looked into the room of Loretta and found her sleeping; that when witness returned from work that evening Loretta was gone; that she did not see her again until the 28th of November, at the hospital of plaintiff in error; that plaintiff in error told her that Loretta was syphilitic; that he was going to treat her husband for the same disease; that she was present when her daughter died; that plaintiff in error and a nurse were there; that a priest was present and that plaintiff in error would not leave the priest in the room alone with her daughter until after she was dead.

In support of the claim of the State that the deceased was in good health at the time she went to the hospital, members of the family testified that she was employed by the Cuneo Printing Company up to the time she went to the hospital. Witnesses for the People also testified that after her death plaintiff in error offered to pay the funeral expenses up to the amount of $400.

On behalf of plaintiff in error, Mabel Moon, a nurse, testified that at the time the fœtus was expelled it was not alive or sufficiently developed to have life, and that there was no rubber hose or tube in the bed; that she was the first one to see the fœtus and the one who called the witness Reed, and that she did not call the witness Irwin.

There is no attempt to deny the fact that the deceased miscarried at this hospital. Plaintiff in error did not take the stand. Attempt was made on the part of plaintiff in

error to prove by the witness Hugh Allison that the deceased had left the employ of the Cuneo Printing Company on the 4th of August, 1927, but it appeared from his statement that he did not have personal knowledge of the matter and that the cards from which he was testifying were not made in his own handwriting. All testimony with reference to this matter was stricken. On the same day this witness testified, plaintiff in error's counsel called the court's attention to the fact that he had issued subpœnas to bring someone from the Cuneo Company who did know of the time when the employment of Loretta Enders ceased and that he would like an opportunity to bring such person in. The court stated, in substance, that it was not yet four o'clock, and that he would have to proceed or rest his case. Plaintiff in error thereupon rested his case and arguments started. The next morning, on the opening of court, plaintiff in error stated to the court that he had two witnesses by whom he expected to show that the deceased had left the employment of the Cuneo Company on August 4, and asked an opportunity to introduce their testimony. This offer was denied.

The clerk of the circuit court was called to show that Angeline Kemp, mother of the deceased, had started suit for $10,000 against plaintiff in error. The admission of this testimony was refused by the court.

It was shown by G. I. Fitzgerald, an undertaker, that he had embalmed the body of the deceased, and he testified that he had used an instrument known as a "trocar" to puncture different parts of the body; that he thrust the trocar downward into the abdomen and punctured the uterus; that a trocar is a long, hollow, pointed instrument used for the purpose of taking off gases from the body; that he knew that he thrust the trocar through the uterus because it was always his practice to do so, and that he knew when the instrument pierced the uterus the body had not been opened.

Helen Smith, secretary of plaintiff in error, was called and an attempt was made to show by her that she had taken a statement of the deceased at the time she came into the hospital, as follows:

"I am flowing and menstruating. Have been flowing for some two weeks or ten days, and I hereby relieve Dr. Rongetti from any responsibility from any care he may give me in the Ashland Boulevard Hospital.

LORETTA ENDERS."

It was shown by the witness that this statement, with various other papers and records from the hospital, had been seized by the State and was in possession of the State's attorney. The State's attorney admitted having possession of the statement but refused to produce it and objected to the use of it as evidence. The court sustained the objection.

Testimony was also given by physicians, as experts, that one could not determine by the examination made and described by Dr. Epstein whether the uterus had been punctured before or after death; that such could not be determined without a microscopic examination, which Dr. Epstein stated he did not make.

Plaintiff in error sought to show that Hazel Reed, Earl Reed and Loraine Irwin were active in preparing the State's case. He was refused permission to so show.

This is substantially all of the evidence in the record.

Concerning plaintiff in error's first assignment,—that is, that the court refused to grant sufficient time to plaintiff in error to prepare his defense,—the following is shown by the record: The indictment was returned on January 9, 1928, at the January, 1928, term of the criminal court. On motion of the then counsel for plaintiff in error the case was on January 26 set for trial on February 27. Said counsel then asked to withdraw from the case on the ground that they were not sufficiently familiar with the practice of criminal law to justify proceeding. Present counsel entered his appearance on February 2, 1928. On

February 16 he was served with notice of a motion to advance the cause from February 27 to February 20. On hearing on this motion he resisted the same on the ground that he had endeavored from the time of his employment to secure from the State's attorney a list of the People's witnesses; that he did not succeed in securing this list until February 16—the date upon which notice was served upon him of the motion to advance the cause; that he observed that the list of witnesses did not contain the name of Ebbe Lou Lindquist; that she had been a witness at the coroner's inquest; that counsel did not know where to find her; that she had left her former place of abode; that he was endeavoring to find her, and he believed if an opportunity be given he could produce her at the next term of court; that there was another witness, Theresa Schengel, whom he had not been able to locate; that plaintiff in error was in jail and that Helen Smith, who acted as his secretary, was virtually in the custody of the State; that a number of records of plaintiff in error had been seized by the State, by reason of which counsel had been handicapped in preparation for trial; that he could not possibly proceed to trial on February 20, 1928, but asked that the case be re-set for February 27 (the date originally fixed) or continued to the next term. No counter-affidavits were filed.

The order of the court allowing the motion to advance the cause indicates that the State's attorney had stated that an attempt had been made to intimidate witnesses for the People, and that for that reason the motion to advance the cause was filed. No such statement appears in the record and no affidavit in support of such a statement was filed. The affidavit of plaintiff in error avers that the nurses who were witnesses for the People were antagonistic, having been discharged by plaintiff in error. It also avers that at the time of the coroner's inquest Ebbe Lou Lindquist testified that she was on duty as a nurse at the time the deceased came to the hospital; that she admitted her, and

knew she was admitted for general observation and treatment for a venereal disease; that at the time she was admitted she was flowing and wore a perineal pad; that the witness removed the pad and was present at the time the examination was made by plaintiff in error; that at that time the patient was bleeding and discharging pus. The affidavit also states that said witness had been threatened by the deputy coroner, was taken into custody and later released on her own recognizance, and was, as far as plaintiff in error was able to learn, at the time of the hearing of the State's motion secreting herself. The testimony given by this witness at the coroner's inquest, as shown by the affidavit, was contradictory of the testimony of Hazel Reed, who stated that she had received the deceased at the hospital and that at the time she came to the hospital she was not suffering from a hemorrhage. The affidavit set out the attempts which had been made to discover the whereabouts of this witness.

The objection to advancing the case was overruled. This was error. Plaintiff in error should have been given a reasonable opportunity to prepare for defense after receiving a list of witnesses from the State. It was unreasonable and unfair to expect him to proceed to trial within four days after receiving notice of a motion to advance the cause, particularly when the records of the hospital were in the custody of the State and a part of the witnesses were under the control of the State's attorney. While a motion to advance the cause is addressed to the sound discretion of the court, it was an abuse of discretion to force plaintiff in error to trial after the delay on the part of the State's attorney in furnishing a list of witnesses under the situation as here shown. There was no showing in the record sufficient to justify the advancement of the cause. *Sutton* v. *People*, 119 Ill. 250.

Plaintiff in error's second contention is that the conduct of the trial judge was prejudicial. The record in the case

contains many instances of interruptions by the court in the examination of witnesses by plaintiff in error's counsel, cross-examination by the court of witnesses for plaintiff in error, and remarks made by the court prejudicial to plaintiff in error. We cannot within the reasonable confines of this opinion set out all of the instances of this character. The following are sufficient to indicate that the trial court went beyond the discretion vested in him to participate in the examination of witnesses, and that his attitude tended to indicate to the jury that he considered plaintiff in error guilty:

Dr. Orlando Scott was offered as an expert witness for plaintiff in error. He was questioned as to the causes of peritonitis, when the following occurred:

Q. "In considering the things that might have contributed to a general peritonitis, outside of a puncture, would you consider the Fallopian tubes as a possible cause?

A. "Absolutely.

Q. "And explain to the jury the manner in which the Fallopian tubes might be the cause of peritonitis and death?

A. "To make it clear—the Fallopian tubes might be the cause of peritonitis and death.

Q. "To make it clear—

The court: "Is there any testimony in the record about infected Fallopian tubes?

Mr. Ditchburne: "No, your honor.

Mr. Stewart: "Well, I say—

The court: "The court doesn't remember any.

Mr. Stewart: "The general pathological examination shows that the tubes and the ovaries were removed and never microscopically examined.

The court: "The absence of evidence does not tend to take the place of evidence."

After a statement by Stewart that the nurses testified to a conversation in which plaintiff in error stated that the deceased had infectious diseases, the judge stated: "The

court does not recall any testimony in the record that indicates or tends to establish any infection at any time in the Fallopian tubes of the hypothetical person and will sustain an objection to any question containing that element, on the ground that there is not that factor in evidence before the court and jury.

Mr. Stewart: "And I respectfully submit that the court has no right to say what is in evidence. That is for the jury to say and draw their conclusions from the evidence, and I except to the remark and the ruling.

The court: "Counsel is quite correct in his statement that it is for the jury to determine after all the facts are in, but it becomes the duty of the court to determine whether or not a fact has been produced in evidence in order to rule on the question of competency of a hypothetical question."

Objection was also made to the following cross-examination of Dr. Scott by the court:

The court: "The court is interested in knowing of that, whether or not in your answers to the hypothetical question propounded to you by counsel for the defendant you included as a factor in the hypothesis that there was added an infected uterus. That is very simple, isn't it?

A. "That is my recollection; yes.

Q. "And you had that in mind as a factor?

A. "Yes, sir.

Q. "Now, if the uterus were not infected at the time of the making of the perforation, would that change your answer with reference to the existence or non-existence of scar tissue?

A. "Well, that would depend entirely upon something that is speculative, and was, as I recall it, not in the question.

The court: "Just answer this question, doctor—Mr. Reporter, please read the question—and answer it yes or no. (Question read.)

A. "I cannot answer it yes or no, your honor, unless I know the conditions in the peritoneal cavity at the time.

The court: "Read the question again to the doctor. (Question read.)

A. "It might or it might not. I would have to know more possibly about the conditions in the peritoneal cavity.

Q. "It might or it might not; is that your answer, doctor?

A. "Yes, sir.

Q. "I have not asked you to assume that.

A. "I am trying to answer your question.

The court: "Answer the question as presented to you.

A. "Not as far as I know. Will you read that? (Question read.) There are not enough facts in the question.

The court: "All you have to do is to say you cannot answer it, doctor.

Mr. Ditchburne: "Is that a fact, doctor? You cannot answer that question?

A. "Not intelligently; no.

The court: "That is the only way we want questions answered, doctor. Now, let us assume, doctor, as a practical proposition, that you have a patient who tells you,—whose history is, so far as he says,—that he has not had syphilis. For some reason you determine you want to find out whether he has or not. Wouldn't you be satisfied with one Wassermann test?

Mr. Stewart: "I make an objection, if the court please.

The court: "Overruled.

Mr. Stewart: "Won't your honor hear my objection?

The court: "You have made it.

Mr. Stewart: "I would like to ask the doctor—I do not want to have him answer until I have an opportunity.

The court: "The objection is overruled.

Mr. Stewart: "And am I not permitted to state the grounds?

The court: "It is not necessary, as counsel knows."

This cross-examination was highly prejudicial. It is generally within the province of the court to propound pertinent and properly-framed questions to a witness to clear up the record when it appears that such questions will not be asked by counsel. The exercise of that power, particularly on such matters as constitute crucial points of the case, is not only embarrassing to counsel if leading, suggestive and improper questions are asked, but is always likely to arouse a serious apprehension in the minds of the jury as to what the court thinks on the issue of guilt. To question a witness is a task of great delicacy when done by the court, and even the tone or inflection of the voice of the judge may tend to indicate to the jury what the court thinks as to the guilt of the defendant. Expressions on his features and the method and manner of ruling on objections are all likely, in a contested case, to be taken by the jury as some indication of the opinion of the court on the question of guilt of the defendant or credibility of the witness. Any extended examination of a witness by the court is essentially unfair unless it is very skillfully and tactfully conducted. Circumstances arise in the trial of a case where orderly disposition of the court's business requires that the court examine witnesses, or even cross-examine them briefly. But such a situation did not arise here. Instances are rare and conditions exceptional which will justify the presiding judge in entering upon and conducting an extended examination of witnesses, and the exercise of a sound discretion will seldom deem such action necessary or advisable. (*Dunn* v. *People*, 172 Ill. 582.) The attitude of the trial court in examining witnesses, in refusing to give an opportunity to counsel for plaintiff in error to state his objections, the manner in which rulings adverse to counsel for plaintiff in error were given, together with numerous errors on the admission of testimony, force this court to the conviction that plaintiff in error has not had a fair trial. ⌜One of the first purposes of orderly administration of the law is that a

defendant, whether guilty or innocent, shall be accorded a fair trial. The fact that the judge may consider the accused to be guilty in nowise lessens his duty to see that he has a fair trial. The prosecutor is not the plaintiff's attorney. He is a public officer charged with the administration of the law, and it is as much his duty to see that a fair trial be given to the defendant as it is the duty of the court. There is not one law for an innocent man and another for a guilty man. Any man, however guilty of the crime charged, is entitled to be convicted according to law.

Counsel for plaintiff in error complains that he was unduly restricted in cross-examination of the State's witnesses. The record contains numerous instances justifying this complaint. It is sufficient to state the following:

On cross-examination of the State's witness Hazel Reed she stated that Ebbe Lou Lindquist was not in the hospital but was off duty the day the patient was admitted. She was asked whether she had in her testimony before the coroner's inquest stated that she did not remember whether Miss Lindquist was there or not. On objection by the State's attorney the court refused to permit her to answer or counsel to proceed with further examination as to what was contained in her testimony before the coroner's inquest, and also later refused to permit the reporter who took her testimony before the coroner's inquest to state what his notes contained. This was error.

It was error to refuse to permit Helen Smith to testify as to the contents of a statement signed by the deceased on entering the hospital. The State's attorney had possession of this statement and refused to produce it. It was competent to show the transactions between the deceased and plaintiff in error when she went to the hospital. (*Clark* v. *People*, 224 Ill. 554.) It was an abuse of discretion to refuse plaintiff in error the opportunity to call witnesses to show when the deceased left her employment. It went to the question of her condition before going to plaintiff in

error's hospital. It was also competent to show, as plaintiff in error attempted, that Angeline Kemp had brought suit against plaintiff in error. She testified for the People, and it was competent to show that she was interested not only as the mother of the deceased but also as plaintiff in a lawsuit against plaintiff in error growing out of this same matter. Other objections as to rulings on the admission of evidence have been made, but as such objections are not likely to arise on another trial they need not be discussed here.

Instructions also are complained of. Instruction No. 7 reads as follows:

"The jury are instructed that the rule requiring the jury to be satisfied of the guilt of the defendant from the evidence beyond a reasonable doubt in order to warrant a conviction is complied with if, taking the testimony altogether, the jury are satisfied beyond a reasonable doubt that the defendant is guilty. The reasonable doubt that the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case not necessary to constitute the crime charged."

This instruction has been condemned in *People* v. *Birger,* 329 Ill. 352, *People* v. *Johnson,* 317 id. 430, and *People* v. *Cramer,* 298 id. 509, and needs no further discussion here.

Instruction No. 14 reads as follows:

"The court instructs the jury as a matter of law, that the indictment in this case is no evidence, in the slightest degree, but is a mere formal charge requiring proof of all the material allegations contained therein, by the testimony of witnesses or facts and circumstances. And you are further instructed that the law presumes the defendant to be innocent of the crime charged in the indictment, until he has been proven to be guilty beyond all reasonable doubt; and this presumption of the law of his innocence is no mere idle theory, to be cast aside by the jury through mere

caprice, passion or prejudice, but it is a substantial part of the law of the land and follows the defendant throughout the entire case, and must not be lost sight of by the jury until it has been overcome by evidence which establishes the defendant's guilt beyond all reasonable doubt and to a moral certainty."

The objection to this instruction is that it does not tell the jury that the defendant is entitled to a presumption of innocence throughout all the steps of the trial, the hearing of evidence, instructions of the court, and until from a consideration of all the evidence he is found guilty beyond a reasonable doubt. In support of this contention plaintiff in error cites *Flynn* v. *People,* 222 Ill. 303, and *People* v. *Ambach,* 247 id. 451. The rule laid down in those cases is, that the defendant is entitled to the presumption of innocence through all the steps of the trial, hearing of evidence, instructions of the court, and until the jury, on a consideration of the evidence, finds that he has been proven guilty beyond a reasonable doubt. The instruction as given here is not open to the objection urged. The jury are told that the presumption of innocence is not to be cast aside by the jury through mere caprice but is a substantial part of the law and follows the defendant throughout the entire case; it must not be lost sight of by the jury until overcome by evidence which establishes defendant's guilt beyond all reasonable doubt and to a moral certainty. This instruction is not a violation of the rule laid down in the cases cited.

Instruction No. 2 is objected to. It reads as follows:

"The court instructs the jury in the language of the statute that whoever, by means of any instrument, medicine, drug or other means whatever, causes any woman, pregnant with child, to abort or miscarry, or attempts to procure or produce an abortion or miscarriage, unless the same were done as necessary for the preservation of the mother's life, shall be imprisoned in the penitentiary not less than one year nor more than ten years; or if death of

the mother results therefrom, the person procuring or causing the abortion or miscarriage shall be guilty of murder."

This instruction is a statement of the law on the crime of abortion or attempted abortion. There was no evidence touching the crime of attempted abortion. It is the contemplation of the law that the jury shall be instructed only concerning the crime of which the defendant stands charged. (*People* v. *Crane,* 302 Ill. 217; *People* v. *Jones,* 263 id. 564.) This instruction should not have been given.

Instruction No. 4 is objected to. It reads as follows:

"The court instructs the jury if you find from the evidence in this case beyond a reasonable doubt that Loretta J. Enders was pregnant with child and that she aborted or miscarried from an operation upon the private parts of her body from which death ensued, and that said operation was performed, with an intent to cause an abortion or miscarriage, by the defendant Amante Rongetti or by any person acting under defendant's direction, or if the defendant aided, abetted and encouraged the operation in any manner, and that the said operation was not done as necessary to preserve the life of Loretta J. Enders, then in such case the court instructs you that, as a matter of law, the defendant is guilty of murder in manner and form as charged in the indictment."

This instruction is objectionable in that it does not limit the proof of the crime to the offense charged in the indictment. The evidence is that the defendant, and no one else, performed the operation causing abortion, and the instruction is likely to mislead the jury to believe that if the defendant encouraged the operation in any manner, regardless of the manner charged in the indictment, he should be found guilty. The instruction in this form should not have been given.

Plaintiff in error complains of the refusal of the court to give certain instructions offered by him. He tendered to the court sixty-eight instructions, and it would be some-

what remarkable if errors did not creep into the court's consideration of them. This was a wholly unjustifiable number of instructions on the points involved in the case, and plaintiff in error is not in a position to complain of the fact that the court, in the length of time which he could devote to the consideration of instructions, refused to give certain instructions tendered. We have examined the given instructions as a whole, and, aside from those herein commented upon, they fully and fairly instruct the jury as to the law.

It is next contended that there was a variance between the indictment and the proof and that the motion in arrest of judgment should have been sustained. The indictment charges an assault with a certain instrument, a more particular description of which is to the grand jurors unknown. The position taken by counsel for plaintiff in error is that the evidence in the record showed positively just what instruments were used and that a better and more particular description of the instrument used was known to the grand jury. The rule is that an indictment need not be more specific than the evidence before the grand jury justifies. An indictment is sufficient which states that a better description of the instrument was not known to the grand jury where it does not affirmatively appear that a better description was known to the grand jury. (*People* v. *O'Connell, ante,* p. 501; *People* v. *Sapp,* 282 Ill. 51.) There is no affirmative evidence appearing in the record that the grand jury had before it a better description of the instrument used in this case than was given in the indictment. This objection, therefore, cannot be sustained.

For the reasons herein given, the judgment of the criminal court is reversed and the cause remanded.

*Reversed and remanded.*

Mr. JUSTICE FARMER, dissenting.