(No. 19341.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ERNEST R. ERICKSON, Plaintiff in Error.

*Opinion filed February 21, 1930—Rehearing denied April 3, 1930.*

JAMES HARTNETT, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and ROY D. JOHNSON, (EDWARD E. WILSON, of counsel,) for the People.

Per CURIAM: Ernest R. Erickson (hereafter referred to as defendant) and William Mitchell were jointly indicted by a grand jury of the criminal court of Cook county at the October term, 1927. The indictment contained two counts. The first count charged them with the larceny on September 14, 1927, of an automobile worth $2100 and belonging to Aaron L. Alpern. The second count charged them with receiving the same property knowing it to have been stolen. Mitchell entered a plea of guilty on October 25, 1927, in this case and also to four other indictments returned against him in the same court wherein he was charged with stealing different automobiles. Defendant entered a plea of not guilty and was tried by a jury during the first week of April, 1928. A motion to enter a *nolle prosse* as to the second count of the indictment was entered. The jury returned a verdict finding defendant guilty as charged in the indictment and found his age to be about forty-five years. Motions for a new trial and in arrest of judgment were denied by the court and defendant was sentenced to the penitentiary. During the latter part of August, 1928, his counsel filed a motion to vacate the judgment and sentence against defendant and sought reconsideration of his motion for a new trial. The basis therefor was that the testimony given by the accomplice, Mitchell, against defendant was false and given for the purpose of securing immunity to himself, and that proof of such immunity could be established upon another trial, as Mitchell was by order of the criminal court of Cook county entered August 15, 1928, released from custody and imprisonment and placed on probation. This motion was also denied. Defendant has sued out a writ of error to review the record.

The proof as presented by the State's witnesses was substantially as follows: Aaron L. Alpern, a carpenter, was working on an apartment building at the corner of Milwaukee and Spaulding avenues, in the city of Chicago,

September 14, 1927. He owned a Nash sedan automobile, which he drove to his work about 8:00 o'clock that morning. He locked it and left it parked across the street from the building upon which he was working. He last saw the car about 4:00 o'clock in the afternoon, and at 4:15 it was gone. After looking around for it he reported the loss to the police. About two weeks later he identified the car at the municipal pier. A different key was in the gear lock when the car was returned to the owner by the police and the ignition lock had been damaged so that the owner's key would not fit the lock.

William Mitchell stated he was a street car conductor and lived at 1728 North Mason avenue, in Chicago. He had known defendant for about two years, both in Chicago and Milwaukee, at which latter place the witness lived for about three months and while there resided within a block of defendant. The witness said he and defendant had spotted the Nash sedan about two weeks before the day they stole it and had taken the key number, and defendant had obtained a key for it in Milwaukee. They intended to get the car the night before, when it was parked in front of where Alpern lived, but could not do so. By agreement they met next day at the corner of Milwaukee and Spaulding avenues. Mitchell drove his Nash coupe to the place and arrived earlier than defendant. Mitchell located the Alpern car parked near by and ascertained that Alpern was at work in the apartment building. This information was given to defendant, who stood across the street watching while Mitchell unlocked the Alpern sedan with the key defendant had given him and drove the car away to within a block or so of where Mitchell lived. Defendant followed Mitchell, driving the latter's coupe. They exchanged cars. Mitchell parked his coupe in front of his house and defendant drove the Alpern sedan into Mitchell's private garage. Mitchell said they stole the car about 11:00 o'clock in the morning. After arriving at

Mitchell's garage he and defendant changed the manufacturer's numbers on the Alpern car. They took off the motor number and serial number and put on some numbers which defendant had. They removed the secret number back of the generator and also other numbers on different parts of the car. The numbers were removed with emery and a file, and were replaced by defendant either with stencil, paint or new metal plates having numbers thereon and which defendant had secured. Defendant had previously arranged for a sale of the car for $500, and told Mitchell to deliver the car to the party next day. Mitchell drove the car down-town the next morning, had a bill of sale made out, and delivered the car in front of one of the entrances to the Sherman Hotel about 1:00 o'clock. Mitchell was arrested there at the time by police officers and taken to the detective bureau, where he saw defendant a day or two later. It was developed upon cross-examination that Mitchell was about twenty-nine years old, married, that he was a deserter from the United States marines, and that he was then using an assumed name. He admitted having entered a plea of guilty in this case on or about October 25, 1927, and also to four other indictments for automobile thefts, and that he had been in jail ever since. He stated he had a conversation with defendant at the detective bureau on Saturday, September 17, 1927, and also at other times. He stated that he did not tell defendant he had been beaten by the police and was compelled to implicate defendant in the case or that he was to be helped out by doing so. He said he had not been beaten by anyone and did not expect any favor on account of giving testimony against defendant.

Frank E. McDonald, a police sergeant of the city of Chicago, stated that he, Lieutenant Cox and two other police officers drove to Milwaukee, Wisconsin, on September 16, 1927, where they saw defendant at the police headquarters there. He said he had known defendant about

nine years. He told defendant that they had come to Milwaukee to get him and take him back to Chicago. Defendant was willing to return with them. The witness and Cox secured a Nash sedan and returned to Chicago that evening, Cox driving the car and the witness and defendant riding in the rear seat. Defendant inquired who called up Milwaukee about him, and the witness replied that he did. Defendant asked how they found out where he lived, and was told Mitchell had informed them, and thereafter defendant stated, "I might as well make a clean breast of it." Defendant asked several questions of the witness relative to retaining a lawyer to represent him, and during the conversation the witness told defendant that Mitchell had been arrested with a car. Defendant replied that he "had a feeling that something was going to happen about that car." Upon inquiry defendant was told where Mitchell was arrested and that he had "hollered," and defendant remarked that he thought Mitchell was a "stand-up guy." Defendant further inquired as to whether the witness knew to whom the car belonged that Mitchell had stolen and as to whether the owner had identified it. The witness told him the officers had found the original motor and serial plates in the basement where Mitchell lived. The witness asked defendant who put the motor and serial numbers on the stolen Nash and where the plates used for that purpose were obtained. Defendant told the witness that he changed the numbers and that he had the plates made in Chicago at the same place the policemen's stars are made. There was further conversation between the witness and defendant, and the latter said that "if you fellows will promise me you will take care of me I will tell you a lot of things you don't know. * * * If it wasn't for fellows like me you fellows wouldn't be where you are at." However, the officers made no promises to defendant. Upon reaching Chicago defendant was taken to the detective bureau, and Mitchell was brought into defendant's presence. Mitchell

was asked, in the presence of defendant, whether or not defendant was the fellow who was with him when he stole the Nash car, and the latter replied that he was. At this time both Mitchell and defendant admitted that they knew each other, and Mitchell said defendant was the same fellow whose Milwaukee address he had given to the police. Defendant did not deny anything that Mitchell said at the time, and in reply said he had nothing to say but was going to do the next best thing and try to help himself. The witness also testified that defendant asked him what car Mitchell was arrested with, and was told that it was the car stolen from Milwaukee avenue, and defendant replied, "That must be the one we took on Wednesday. * * * We watched that car for four or five days and I got the key number." He also stated he was surprised that Mitchell "hollered," and said, "I thought he would stand up; if he hadn't 'hollered' it is a cinch I would not have told you anything." Defendant told witness that he obtained the key for the Nash car from a Nash distributor in Milwaukee. He also said he could fix a Nash so the owner could not identify it.

William Cox, the police lieutenant who was with McDonald and defendant when the latter was returned to Chicago from Milwaukee, testified that he had known defendant about eight years. He corroborated some of the statements made by McDonald, and said that he heard defendant ask whether Mitchell "squawked," and when told that he had, he replied, "It looks kind of bad for me." The witness stated that defendant told him at the detective bureau that he and Mitchell had been driving around for three or four days and found this Nash car in front of a new building that was being constructed; that he had a duplicate key made and that he and Mitchell went up one afternoon and took the Nash; that defendant drove Mitchell's car back to the latter's garage while Mitchell drove Alpern's Nash away. He stated defendant also told him that when

they reached Mitchell's house they put the Nash car in his garage and then changed the several numbers on the car. The witness asked defendant who told him what the secret number was, and he replied, "What do you think I would be stealing Nash cars for if I didn't know where the secret number was?" Defendant told the witness that he got the keys from the Nash agency in Milwaukee and the number plates he used for re-placing on the car were made in Chicago.

The defense presented by defendant consisted of his own testimony and of five other witnesses. The testimony of four of these witnesses was offered for the purpose of establishing an alibi. Their testimony was such as to account for the whereabouts of defendant from 9:30 in the morning of September 14 until approximately 4:30 that afternoon. This evidence tended to prove that defendant was with a friend, who is in the contracting business, from 9:30 in the morning of September 14, 1927, until noon; that he was at lunch down-town during the noon hour with his brother; that at 1:00 o'clock he went on the elevated railway to Evanston, and that he was in Evanston, at the home of Mrs. Brown, one of the witnesses, at 2:00 o'clock and went with her and her husband, who were old acquaintances of defendant, on an automobile trip that afternoon to Kenosha, Wisconsin. If this testimony was true defendant could not have been present when the car was actually taken away from the place where the owner had parked it. Defendant testified admitting that he had known Mitchell about two years but denied all the statements made and the testimony offered by Mitchell and the police officers. He also denied having anything to do with the stealing of the Alpern automobile or knowing anything about it. He stated that he had not previously known either McDonald or Cox, of the Chicago police force. He admitted having had conversations with Mitchell after Mitchell had been arrested, and that Mitchell told him that

the police beat him up and compelled him to tell the story implicating defendant in the theft of the automobile. He said Mitchell showed him bruises and marks on his body caused by the police beating him. He also stated that Mitchell had told him that the police had arrested his wife, and that he had implicated defendant because he had to get his own wife out of it. He said that the last time he saw Mitchell was on July 7, at which time he had purchased some whisky from Mitchell.

In rebuttal the State presented the testimony of police officer O'Connell, who testified that Mitchell was not beaten at any time while he was in the custody of the police officers. Mitchell also testified in rebuttal, stating that when he and defendant went to Milwaukee to live they both moved there on the same day. He denied ever having been in the liquor business and denied having told defendant he had been beaten after he was arrested.

The foregoing is a fair statement of the substance of the most important testimony offered on the trial.

Counsel for defendant, as shown by his assignment of errors, contends (1) that defendant was not arraigned and no plea was entered; (2) that the court erred in denying defendant's motion to vacate the judgment and set aside the sentence; and (3) that the court erred in denying the motion for a new trial.

There is no merit in the first contention of defendant. The additional record filed in this court shows he was arraigned, entered a plea of not guilty and issue was joined before a jury.

The second contention seems to be based chiefly upon an alleged conspiracy between the State's attorney, Mitchell, the confessed accomplice of defendant, and the police officers, whereby they agreed to endeavor to convict defendant (referred to as an innocent man) and grant immunity to Mitchell. Defendant's counsel says their agreement was concealed from defendant and his counsel and also from the

jury, but that such an arrangement existed because Mitchell was later released from custody. Counsel seems to intimate that the testimony of an accomplice is improper; that the State's attorney made statements to the jury which were not the law and not proper, and that the testimony of the police officers was incompetent. It is unnecessary to discuss at length the admissibility or value of the evidence of an accomplice. It has long been the rule in this State that the uncorroborated testimony of an accomplice is sufficient to sustain a conviction. (*People* v. *Feinberg,* 237 Ill. 348; *Friedberg* v. *People,* 102 id. 160.) Such evidence, however, when not corroborated by other testimony or circumstances which prove guilt beyond a reasonable doubt, is subject to suspicion and should be acted upon with great caution. (*People* v. *Lewis,* 313 Ill. 312.) Whether the evidence is sufficient to sustain a conviction is largely a question for the jury, and it is only when the court is satisfied, from a careful consideration of the whole testimony, that it is not sufficient to sustain the guilt of the accused that it will interfere with the verdict of a jury on that ground. (*People* v. *Feinberg, supra.*) The evidence given by the police officers was not objected to at any time and there is no claim that any statements were obtained from defendant by force. The record shows such admissions, if made at all, to have been given voluntarily. We are referred to no serious remarks made on the part of the State's attorney, or any statements objected to by counsel, which necessarily affected the interests of defendant. From our examination of the record we find no circumstances sufficient to establish the conspiracy to convict defendant, as charged by his counsel. The accomplice, Mitchell, stated, when examined, what his associations were with defendant and also with the State's attorney. He admitted having pleaded guilty to four other automobile theft cases, and said he had not yet been confined in the penitentiary but expected no favor on account of his testimony. It is true that by defendant's supple-

mentary bill of exceptions, set forth in the abstract as a part of the proceedings or motion to vacate the judgment and sentence against defendant, it is shown Mitchell was indicted and pleaded guilty to the five automobile theft cases and was later released from custody on probation. His release, however, occurred over four months after defendant was found guilty by a jury.

Under counsel's last assignment of error he sets forth nineteen distinct grounds for reversal, some of which have been previously discussed and some are not argued in the briefs. The remaining ones of sufficient importance for our consideration are, that the defendant was unduly limited in the presentation of his case, and of the law pertaining thereto, to the jury, and that the court erred in the giving and refusing of instructions. The limitation complained of was chiefly in the reading of the law and of cases pertaining to the amount of weight and credibility that should be given to the testimony of an accomplice. Perhaps there were some unnecessary interruptions of counsel for defendant, but nothing of sufficient consequence occurred to materially prejudice the rights of defendant. The jury were fully advised on the subject from the legal authorities read to them. The brief of counsel states that all of the thirteen instructions given to the jury were prepared by the court and that those offered by defendant were refused. We have read all of the given and offered instructions as they appear in the abstract, and as a series we think those given fairly and sufficiently state the law covering the type of case which was being presented to the jury. Complaint is made that the jury were not fully informed in one instruction that the testimony of an accomplice should be received with great caution. The value and worth of an accomplice's evidence was fully explained to the jury and legal authorities upon the point were read to the jury by defendant's counsel. There can be no question but that the jury understood the point made by counsel on this subject.

The jury are the judges of the weight to be given to the testimony of the witnesses presented in a criminal case, and a reviewing court will not substitute its opinion or judgment for that of the jury where no prejudicial error has been committed and the verdict does not appear to have been the result of passion and prejudice. There is some error in the record before us, but in our opinion there is nothing of sufficient consequence to warrant a reversal of the judgment.

The judgment will therefore be affirmed.

*Judgment affirmed.*