(No. 21578.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* VERA WITTE, Plaintiff in Error.

*Opinion filed December 23, 1932.*

REUBEN R. TIFFANY, and JOHN J. BRITT, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, LOUIS F. REINHOLD, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

By the verdict of a jury in the circuit court of Stephenson county, Vera Witte, the plaintiff in error, (herein called the defendant,) was found guilty of murdering her husband, William Witte, and sentenced to life imprisonment. After motions for a new trial and in arrest of judgment were overruled the trial court sentenced her to the State Reformatory for Women at Dwight for the term of her natural life. A reversal of the action of the trial court is sought by this writ of error.

The homicide for which the defendant was convicted occurred near· the southwest corner of the court house square in the city of Freeport during the afternoon of June 9, 1931. At that time the defendant and her husband had been married a little over one year, he being about forty-six years old and she twenty years his junior. Both had been employed by the Illinois Central Railroad Company, she in the Freeport office and he as a locomotive engineer on a run out of that city. It was in the course of this employment that they became acquainted. Witte's first wife died in April, 1928, leaving him with two grown children. In May, 1929, Witte started keeping company with the defendant and they occasionally took trips together to various places. In May, 1930, they were secretly married, the idea of secrecy originating with the defendant, although it was agreeable, also, to Witte. They continued to live apart in Freeport, keeping their respective employments, until August, 1930, when their marriage became publicly known. After their marriage, and before they started living together, Witte borrowed $290 from the defendant, which she obtained by a loan upon a life insurance policy. This loan was never re-paid. After August, 1930, the household comprised the husband and wife and the twenty-two-year old son and twenty-one-year old daughter of Witte. The defendant brought some of her own house furnishings with her to the new home. In October, 1930, she and Witte quarreled, Witte telling her that she must divorce him. This she refused to do, and in the ensuing argument she slapped Witte and he also struck her. That night she took seven sedative tablets in order to induce sleep. In the morning she became very sick and fell down-stairs while calling to Witte to come to her help. The fall rendered her unconscious and impaired her eyesight for several days. On October 16, 1930, Witte filed his petition in the county court of Stephenson county alleging the defendant to be insane. Following a hearing before a commission of physicians she was

adjudged insane and committed to the East Moline State Hospital. Witte accompanied her to the hospital, where she remained until November 3, 1930, when she was discharged from the institution as cured. The records of the county court which committed her show her discharge as cured and that she was restored to all of her legal rights. Before bringing her home from the hospital Witte tried to get her to agree to divorce him, but this she refused to do. Upon returning home she resided with her husband until December 9, 1930. The day previous the two had entered into a written agreement which could be nullified with the consent of both. By this agreement the parties were to live apart, the defendant not to molest Witte, who was to provide her with certain necessities and in addition pay her $20 every two weeks. Four payments were made under this agreement. While visiting in St. Paul the defendant received a letter from Witte on February 1, 1931, wherein he reiterated his desire that she divorce him, concluding this with: "If you push me too far I will use a gun and end some of my troubles." On February 17, 1931, she was served with a summons in a divorce action instituted by Witte, alleging that she had been guilty of extreme and repeated cruelty towards him. The case was heard by a jury, which found that the allegations of the bill were not sustained by the evidence. On May 18, 1931, the defendant filed her bill in the circuit court asking for separate maintenance upon ground of cruelty. On June 9, 1931, this case was heard by the circuit judge of Stephenson county without a jury. The court found for Witte, who had contested the action. At the conclusion of the case the defendant had a talk with the judge who had presided at the trial. From this conversation she drew the wholly unwarranted conclusion that the judge told her that she must go back to Witte and live with him. Departing from the court house she met Witte, and told him, in effect, that she would be back with him in a few days. She then, in company

with a Miss Kenyon, took her mother and step-father home in her car. While at the house she went inside for a very short time, and upon returning to her car she and Miss Kenyon drove down-town to the court house square. There the defendant parked her car on the south side of Stephenson street so that it faced east and was across the street from the drinking fountains which are located on the southeast corner of the court house square. The return to town was to keep an appointment with her attorney, whose office was in a building on the southwest corner of Stephenson street and Galena avenue. She saw Witte standing by the drinking fountains before she got out of her car and she and Miss Kenyon conversed about him. Witte then walked west on the north side of Stephenson street to a position near a traffic light-post on the southwest corner of the court house square and approximately opposite a soldier's monument which is located in the southwest corner of the court house yard. The defendant walked west on the south side of Stephenson street, saw Witte near the light-post and crossed the street to him. When she crossed Stephenson street she carried in her hands a soft felt hat, an envelope and a hand bag. According to her testimony she stepped on the curb and started a conversation with Witte by saying, "Well, Bill, congratulations; you won," and then asked him when it would be convenient for her to come back. She said he informed her that she was not coming back. She then related to him her version of what the trial judge had told her about her going back to her husband. Witte, she said, then cursed the courts and said, "If they will not keep you away this will." She said that she then felt a pressure about the center of her chest, as she was then only about a foot and a half away from Witte. On looking down she said she saw the barrel of a revolver; that she immediately grasped his arm with her right hand, stepping forward at the same time in an endeavor to grasp hold of the revolver with her left hand. She was positive

that she held her purse suspended from the left hand or wrist at this time, and was of the opinion, also, that her hat was held in her left hand at the time. When she reached for the revolver she said it was discharged and Witte fell against her, causing her to lose her balance and fall to the walk on her left knee. She felt a severe pain in that knee and thought she was shot. Looking down as she fell she testified that she saw a revolver fall out of her hat. What happened after that she said she did not remember, although she said that she heard expressions of "Murder," "She has killed him," and "She shot her husband." She recalled walking across the street with someone, but said she did not fully regain her memory until she was in the county jail. She denied having any malice toward Witte, and also denied the ownership or possession of a revolver at the time of the killing.

Elmer Prall, a real estate agent, who was acquainted with the defendant, saw her come west on the south side of Stephenson street, walk past him, then turn north and cross Stephenson street, step up on the curb, turn east and confront Witte from a distance of about three feet. Prall thereupon heard a shot, saw Witte stagger, walk forward, following a circular route for some fifteen or eighteen feet to the west side of the monument, where he fell. Prall did not see who fired the first shot, as the hands of the defendant were covered by a hat, but he did see her raise both hands as she faced Witte. According to Prall she approached the prostrate form of Witte with her hat in one hand and a revolver in the other and fired two shots at him and made an unsuccessful attempt to fire still another shot. After the first shot Prall said that her foot seemed to slip on the curbing and she appeared to drop down on one knee.

William Pfile was seated on a near by bench and noticed Witte standing by the traffic light-post. He saw the defendant coming across Stephenson street toward Witte,

having in her hand what he took to be a hat, her hands appearing to be together. She stepped up on the walk and talked to Witte a moment or so, the two being not over a couple of feet apart. Pfile was looking at Witte and the defendant as the first shot was fired. According to Pfile she did not fall down after the first shot but walked around some. The next two shots were fired right after the first and before Witte staggered and fell. Witness said he was close to the couple—within about eight feet—but he could not hear their remarks, due to his impaired hearing.

William Mitchell was occupying a park bench and saw Witte by the traffic light-post. He first saw the defendant when she was about half way across Stephenson street, coming toward him. She walked up to Witte. Witness then looked away, and after an interval, which was not very long, he heard a shot. He saw Witte lying on the west curb of the monument but did not observe the defendant do anything. He then heard two more shots. He did not see who fired them but did see a woman's hat, and that the defendant was then standing out by the curb, fac- ing southeast, and holding a revolver.

Thomas Green was sitting on the court house curb-stone, reading a letter. During his perusal of the letter he stated that he would look up once in a while toward the street. On one of these occasions he saw the defendant coming across the street, she being almost at the curb when he first saw her. He resumed his reading, and when he again looked up she was talking to Witte, who was near the traffic sign- post. Witness again turned to his letter, heard a shot, looked up, and saw Witte stagger around and finally fall. He then saw the defendant shoot a couple of times at Witte. Green heard the defendant say to Robert Stewart, "Take me to the station," and saw her hand the gun to Stewart.

William Becker was standing on the curb retaining wall of the court house yard, on the Stephenson street side, talk- ing with an acquaintance. He heard a shot but did not

look up, as he thought it was an automobile backfire. Immediately after the report he heard a groan, and looking up he saw a man in a stooping position in the act of turning and throwing his arms across his chest. A bareheaded woman was standing at the edge of the walk, facing north, the wounded man being north of her. The woman held a revolver in her right hand, and while the man staggered north she fired twice and tried to fire a third time but with no result. Witness said he was about fifteen feet east of the woman, whom he identified as the defendant. She looked at the revolver, let it drop down, walked a short distance and stood still. Witness got to within about six feet of her and saw that she held some object under her arm. He also observed her change the gun from hand to hand and brush her hair back out of her face. Becker recognized the wounded man as Witte. He heard Stewart ask the defendant what she had been doing, and her reply, "Well, I shot him," or words to that effect. He heard Stewart ask for the gun, which the defendant handed over.

Ella Evers saw Witte and the defendant by the traffic sign and again observed them, for she turned on hearing a muzzled sound and heard Witte exclaim "Oh!" as he ran and fell. Witness said two more shots were fired. She saw both, but did not hear the last one, as it was also muzzled. Thereupon witness left the scene of the shooting.

Frank Singer was talking to witness Prall when he saw the defendant cross the street toward the monument. He saw no action but heard three shots. Then he saw Witte tumble down. He then saw the defendant come up and point the gun at Witte, but it was not discharged.

Louis Hart testified he was close by and saw the defendant point a gun at Witte. He saw her shoot and saw Witte stagger off. He said she followed Witte and shot again as he was falling. Witness then saw her step to the west side of the monument and shoot again. This witness states positively that the defendant possessed the revolver

when the first shot was fired and that the revolver was in plain sight.

Dawn Smith, who knew both the deceased and the defendant, saw the defendant coming across Stephenson street toward the monument and toward Witte, who was standing by the traffic light-pole. He noticed the defendant step up on the curb and face Witte. The defendant at the time was carrying her hat in her hand. The two faced each other for only a moment and then the first shot was fired. Witte reeled forward, with his hands clasping his chest or stomach. Two more shots were fired, and Witte finally fell on the west side of the monument abutment. Witness observed the defendant holding the gun in her hand after the first shot.

Robert Stewart, an ex-sheriff of Stephenson county, was acquainted with the defendant. He had started toward the intersection of Stephenson street and Galena avenue, going north. Hearing a shot it took him an instant to ascertain from whence it came. He heard second and third shots and by this time was able to locate the place of the shooting. As he looked he saw the head of a man sink out of sight behind an automobile. Upon nearing the spot he was able to see the defendant bending over the body of Witte with a revolver in her hand. He saw her press the revolver against Witte's back, take the gun away, raise the hammer and press the gun against Witte again. Stewart reached the defendant, who was facing away from him, and said to her, "What are you doing?" and she replied, "I just killed my husband." Stewart asked her to hand over the gun, which she did, it being in her left hand at the time. In response to her query as to what disposition he was going to make of her, he told her that he was going to turn her over to an officer. She requested him to take her to the station before a crowd gathered. This he started to do, and on the way met police chief Adam Wilkey, to whom he delivered his prisoner and the gun.

Adam Wilkey, the police chief, testified to the delivery of the defendant and gun to him by Stewart and that he took her to the police station. Wilkey repeated the statement of Stewart, made in the presence of the defendant, that she said she had killed her husband. Upon arrival at the station the defendant requested and was allowed permission to use the telephone. She endeavored to call several numbers, got one connection, and according to Wilkey and a deputy sheriff named Lee Aurand she said, "Is this Uncle Fred?" She continued the conversation by saying also, "Prepare yourself for a shock. I just shot my husband. Break the news easy to mother." In response to Wilkey's query as to why she had shot Witte she replied that she did not know. This witness said that the defendant's left knee was bruised—looked rather like a scrape from falling on something hard. This wound was bleeding. It could be seen through her stocking, and there was a tear in the stocking about the size of a silver dollar.

Mildred Kenyon, the companion of the defendant, testified that the defendant did not have anything with her except her dog when she came out of her mother's house after the momentary visit when the mother was taken home. Witness said that the defendant and she talked about Witte after they saw him standing by the fountains. As disclosed by the record, this conversation contained no threats by the defendant but did show that she believed she would go back and live with Witte. At no place does Miss Kenyon say that the defendant had a gun with her in the car, or that she took one with her when getting out of the car and secreted it in the hat which she carried in her hand.

From the foregoing recital of testimony it is evident that the claim of the defendant that she killed her husband in self-defense fails through lack of sufficient evidentiary support. Giving to her every advantage that can be taken from the failure of the foregoing accounts to agree in all particulars, the fact remains that the testimony of the wit-

nesses to the shooting agrees on all points vitally necessary to support the contention of the People that the defendant killed Witte and that she did not do so in self-defense. She testified that Witte was the possessor of the gun, and that in her endeavors to get the gun from him, and thereby protect herself, the gun was discharged and he received his fatal wound. This story of struggling for the revolver received support from only one witness, while there was an utter lack of testimony to sustain the defendant's contention that Witte was the possessor of the revolver originally. If the jury placed any credence in the testimony about the struggle for the gun they would have been equally as well justified in believing that the struggle ensued because Witte made an attempt to wrest the revolver away from the defendant and not she from him. One witness testified that the defendant was in the possession of the revolver when the first shot was fired. She made no denial when Stewart told the chief of police, Wilkey, that she had shot her husband. She did not deny the act at the station, nor did she make any statement that she was acting in self-defense.

Counsel for the defendant seek to impress upon this court that the self-defense brought to light in this case possesses some peculiarities that the ordinary plea of self-defense does not have. As we understand the argument of counsel for the defendant, it is sought to flavor the plea of self-defense with some of the circumstances that would entitle one to enter a plea of misadventure. In other words, it is insisted that the defendant, in the struggle which she states took place for the possession of the revolver, did not intend to and did not secure control of the weapon for the purpose of killing Witte but was engaged in an effort to prevent harm to herself by making it impossible for Witte to shoot her, and by the discharge of the revolver, without intent or design on her part, Witte was shot. Under these circumstances the jury did not go contrary to the manifest

weight of the evidence when they determined by their finding that she fired the shot which killed Witte. Where the testimony regarding material facts in issue is in conflict and the conclusion reached must of necessity depend upon the credit to be given the testimony of opposing witnesses, it is the peculiar province of the jury to determine upon which side of the controversy the truth lies, and this court will not substitute its judgment for that of the jury unless it is clear that there is reasonable doubt of the guilt of the accused. (*People* v. *O'Grady,* 339 Ill. 263.) It is largely for the jury to determine if the evidence is sufficient to sustain a conviction. In the absence of prejudicial error, where the verdict does not appear to have been the result of passion and prejudice, this court will not disturb such verdict after a careful consideration of the whole evidence. *People* v. *Erickson,* 338 Ill. 542.

Evidence was introduced by the defendant in support of her defense of insanity. She testified that her mind became almost blank after the first shot was fired, and her counsel argue that no attempt was made to show her mental capacity after that time. The presumption of sanity attached to her when she went on trial—*i. e.,* that she was sane shortly before, during and after the commission of the crime with which she was charged. She restricted her insanity plea to the time after Witte received his mortal wound, undoubtedly to account for her inability to explain her words and acts immediately following the first shot. In her conversation with Stewart immediately after the shooting she did not act and speak like a person bereft of her mental faculties. She was conscious enough of the occasion and the seriousness of her act not to want to be in a crowd. When she introduced testimony seeking to show that she was insane, the presumption of her sanity disappeared and the burden then rested upon the People to show by rebuttal testimony that she was sane during the period of time she said she was insane. The People introduced the testimony

of both lay and expert witnesses in rebuttal. To the admission of this testimony the defendant objected on the ground that in response to questions put to them by the State's attorney the witnesses gave answers which caused them to express opinions upon ultimate facts, thereby invading the province of the jury. These objections were properly overruled by the trial court. We have examined the questions and answers objected to and find them limited to conclusions drawn from observations of or conversations with the defendant. The opinions of non-expert witnesses as to the sanity, mental condition and capacity of a person charged with crime to distinguish between right and wrong are admissible where such witnesses have had opportunities to observe or converse with such person and state their reasons and the facts observed on which they base their opinions. Such opinions, to be admissible, must be limited to conclusions drawn from the specific facts thus disclosed, and it is for the jury to determine the weight to be given such testimony. (*Jamison* v. *People* 145 Ill. 357.) This rule has been uniformly followed in this State (*People* v. *Krauser,* 315 Ill. 485,) and was not violated in the case now before us.

The defendant further complains because the trial court refused to grant her motion for a change of venue based upon allegations that the inhabitants of Stephenson county were so prejudiced against her that she could not obtain a fair trial. Her motion was accompanied by her affidavit, together with three other affidavits, two of which were made by residents of the city of Freeport and the third by a resident out in the county. The People traversed the motion and filed sixty counter-affidavits. The chief complaint of the defendant is that a daily newspaper in Freeport with a general circulation throughout Stephenson county published articles about the shooting of Witte which were highly prejudicial to her, publicly charging her to have committed a cold-blooded murder; that because of the newspaper arti-

cles she was pre-judged by the citizenry, and that the idea of her guilt was so firmly fixed in the minds of people eligible to serve as jurors that she would be unable to have a fair trial. The three affidavits in support of her motion alleged generally that the affiants had heard her case discussed in general conversations on numerous occasions wherein she was said to be guilty of the murder of her husband, that the case would be shortly disposed of as she had no defense, and that she should be hanged. All conclude with the statement that she could not obtain an impartial trial by a jury from the county owing to the fixed opinion of her guilt; that this opinion of guilt was general and fixed, due to the publishing and circulation of the details of the affair in full by the newspaper in question. The sixty affidavits filed by the People were made by persons from varied walks of life, twelve by Freeport citizens and the remainder from residents of towns and villages throughout the county. The general tenor of these affidavits was a denial of the allegations contained in the affidavits of the defendant. The sixty affiants had never heard anyone express himself as prejudiced against the defendant, and said that no greater interest was taken by the public in her case than would be generally taken in a murder case. They had heard of no threats of violence against her, and believed that no general feeling against her existed in the county such as would prevent her from receiving a fair and impartial trial. This was the condition of the record when the court passed on the motion for a change of venue.

The defendant was confined in jail on June 9 and was not placed on trial until the following November. If the public mind was inflamed against her immediately after the killing, (and the record does not show this to be true,) the record is equally bare of any showing that the public mind was inflamed and prejudiced against her at the time the jury was selected. A motion for a change of venue

based upon the prejudice of the inhabitants of the county is addressed to the sound discretion of the trial court. (*People* v. *Cobb*, 343 Ill. 78; *People* v. *Pfanschmidt*, 262 id. 411.) Whether prejudice exists is a question of fact. (*People* v. *Fricker*, 320 Ill. 495.) Of course, it is not necessary for the defendant to show beyond a reasonable doubt, or even by a preponderance of the evidence, that prejudice exixts. All that needs to be done is to raise a reasonable apprehension that the defendant could not receive a fair trial. The disposal of the question is not controlled by the number of affidavits in support of or against the motion, and the trial court is limited to a consideration of the defendant's motion and affidavits and the traverse and counter-affidavits of the People. The trial court clearly used sound discretion in refusing to allow the motion for change of venue. Without indulging in unwarranted inferences, the showing made in behalf of the People was amply sufficient to dispel all reasonable apprehension that the defendant could not receive a fair trial by jurors selected from Stephenson county. During the selection of the jury the defendant again submitted her affidavit and moved the trial court to reconsider its former ruling denying her motion for a change of venue. The court overruled this motion, and the defendant also alleged this as error in her motions for new trial and in arrest of judgment. No error was committed by the trial court in again overruling this motion. An examination of the record fails to disclose anything occurring during the trial to convince the trial court that it had made a mistake in overruling the motion for a change of venue in the first instance, and in this respect · the trial court acted properly in denying the motions for a new trial and in arrest of judgment.

The defendant takes an indirect path back to her theory of inability to pick a fair and impartial jury from the county when she states that the jury which was selected arrived at a verdict which was the result of passion and

prejudice. In an endeavor to establish this point much is made of the fact that the jury deliberated upon the fate of the defendant for only three hours. This element of time is stressed in the allegation that it would be impossible for a jury to properly digest the evidence, exhibits and instructions within that time and render a fair and impartial verdict. From the facts in evidence the jury were fully warranted in believing, beyond a reasonable doubt, that the element of malice necessary to make murder out of the killing was present. If the jury believed (and they did) that the circumstances detailed were sufficient to engender malice in the defendant toward Witte, and believed this despite her testimony to the contrary, we cannot say that they went against the manifest weight of the evidence and yielded to passion and prejudice in arriving at their verdict.

Objections were made by counsel for the defendant to ten of the fifteen instructions given for the People. Particular stress is laid upon objections to the 13th and 15th instructions, which are as follows:

13. "The court instructs the jury that the insanity of the defendant either before or after the commission of a crime cannot excuse the crime. Only insanity existing at the very time of the crime can excuse the same."

15. "The court instructs the jury that if from all the evidence in the case you believe beyond a reasonable doubt that the defendant committed the crime of which she is accused, in manner and form as charged in the indictment, and at the time of the commission of such crime the defendant knew that it was wrong to commit such crime and was mentally capable of choosing either to do or not to do the act or acts constituting such crime, and of governing her conduct in accordance with such choice, then it is your duty under the law to find her guilty, even though you should believe from the evidence that at the time of the commission of the crime, she was not entirely and perfectly sane."

It is claimed that these instructions were erroneous because they both infer that a crime had been committed by the defendant, and that the trial court, except where the defendant has admitted the killing, should not have stated, directly or indirectly, that she had committed a crime. We do not believe these instructions were susceptible to any such strained construction or that the jury were misled by the words of the trial court.

Objections were also made to the use of the words "not entirely" and "perfectly sane" in the 15th instruction. These objections cannot be sustained, as the instructions in question state the law with substantial accuracy. *People* v. *Lowhone,* 292 Ill. 32.

Consideration of the whole series shows that eighteen instructions were given on behalf of the defendant and only two of her instructions requested were refused. In the granted instructions, both of her defenses, insanity and self-defense, were fairly presented to the jury. Most of the instructions given for the People were those commonly used in cases of like nature and oft-times sanctioned by decisions of this court. In considering assignments of error on giving or refusing instructions they will be taken as a series, and, when so considered, if they together fairly state the law it is not ground for reversal that one or more, standing alone, might be superfluous or misleading. (*People* v. *Hartwell,* 341 Ill. 155.) Without setting forth at length the objections made to the other instructions, many of which are trivial, suffice it to say that after a careful review of all of them we are of the opinion that, taken as a whole, the jury were fairly instructed in this case and that nothing contained in any of the instructions, either given or refused, can be said to have been prejudicial to the defendant.

We find no reversible error, and therefore the judgment of the trial court is affirmed. *Judgment affirmed.*